**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


| | | |
|---|---|---|
| NICK EMBRICO, | : | CIVIL ACTION |
| RICHARD E. THOMAS, | : | |
| FRANK VITUCCI and | : | NO. 03-CV-5571 |
| ROY WILLIAMS, | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | |
| | : | |
| UNITED STATES STEEL | : | |
| CORPORATION, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## MEMORANDUM AND ORDER

Anita B. Brody, J.                                November  30,  2005


      Plaintiffs Nick Embrico, Richard E. Thomas, Frank Vitucci, and Roy Williams are all

former non-union managerial employees of the Fairless Works plant owned by the defendant

United States Steel Corporation ("U.S. Steel").  They all retired under the defendant's "Voluntary

Early Retirement Program" ("VERP") in the fall of 2001.  The plaintiffs bring this action

alleging that the manner in which the defendant implemented its VERP violated the Age

Discrimination in Employment Act (ADEA) of 1967, 29 U.S.C. §§ 621 *et seq.* (2005), the

Pennsylvania Human Relations Act (PHRA), Pa. Stat. Ann. Tit. 43 §§ 951 *et seq.* (2005), and the

Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001 *et seq.* (2005).

Additionally, Plaintiffs Thomas and Williams allege that U.S. Steel discriminated against them

on the basis of race, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42

U.S.C. § 2000e-5 (2005), and the PHRA.  Plaintiff Vitucci also alleges that U.S. Steel violated

the retaliation provision of the ADEA when it allegedly failed to secure him a position at Fairless

Works as an independent contractor after he retired.  Pursuant to 28 U.S.C. §§ 1331 and 1367,

subject-matter jurisdiction is proper due to the presence of a federal question.  Before me is the

defendant U.S. Steel's motion for summary judgment.  For the reasons that follow, I will grant

the motion as to all counts.

**I.      Background[1]**

All four plaintiffs are former employees of Fairless Works, a steel manufacturing plant

owned and managed by U.S. Steel and located in Bucks County, Pennsylvania.  (Def.'s Reply at

1.)  When it opened in 1952, Fairless Works was a steel mill with several operations.  (Id.)  Over

the years that followed, Fairless Works underwent a number of restructurings.  Finally, in 1991,

U.S. Steel shut down a majority of the plant, reducing Fairless Works's operations to a "Tin

Line" or "tin operation" and a "Galvanized Line" or "galvanized operation" (sometimes referred

to as "the sheet operation" by the defendant).  (Id.)

At some point during the 1990s, U.S. Steel began to contemplate closing the Tin Line at

Fairless Works.  (Pl.'s Second Amend. Resp. to Def.'s Mot. for Summ. J. at 11.)  On August 2,

2001, at the request of Fred Harnack, General Manager of the Mon Valley Works facility,[2] and

David Lohr, Vice President of Operations, Fairless Works Operating Manager Dennis Jones

("Jones") prepared and submitted two planning documents in anticipation of a possible Tin Line

---

[1] All inferences drawn from the underlying facts are viewed in the light most favorable to the plaintiffs, the non-moving party, and their allegations are taken as true when supported by proper proofs wherever those allegations conflict with those of the defendant.  Kopec v. Tate, 361 F.3d 772, 775 (3d Cir. 2004).

[2] Fairless Works and two other plants located in Pennsylvania comprise Mon Valley Works, an integrated steelmaking facility operated by U.S. Steel.  (Pl.'s Amend. Resp. at 1.)

closure at Fairless Works.[3]  (Id. at 8-9; Pl.'s Ex. E.)

Jones's first document was a memorandum entitled "Fairless Galvanize Manning" ("the Manning Proposal").  Jones characterized it as a "restructuring evaluation and proposal to minimally man the Fairless Galvanize Operation as a stand-alone profitable entity..."  (Pl.'s Second Amend. Resp. at 8; Pl.'s Ex. E.)  The Manning Proposal contained a projected list of Operating and Administration positions that would be needed after the closure.  (See Jones Dep., Pl.'s Ex. F, "Jones Ex. 3.")

Jones described his second document, "the Roster," as a "preliminary management and administrative roster, including those required to run the facility as well as those available for other assignments."  (Pl.'s Second Amend. Resp. at 8-9; Pl.'s Ex. E.)  The Roster contains two lists.  (Jones Dep., Pl.'s Ex. F, "Jones Ex. 4.")  The first list, entitled "Galvanize Only Management Staff," lists eighteen of the administrative positions named in the Manning Proposal, with the names of one or two Fairless Works managers next to each position and generally no comments or notations next to their names.[4]  The second list, entitled "Others Not Included in Above," lists twenty-eight names, including all four plaintiffs.  Under a column entitled "Comments," notations such as "Pension," "Transferable," "Realty" and "No Plan" appear next to the names on the second list.  The right-most column, entitled "Rating/Other," lists a performance rating next to thirteen of the twenty-eight listed employees, including the plaintiffs.

_____

[3] The plaintiffs make no allegation that they knew that these two documents existed when they chose to take the VERP.

[4] The only exception is next to "Accounting Manager," where two names are listed with the accompanying notation, "Only one required."

In explaining the development of the Roster's "Galvanized Only Management Staff" list, Jones testified that it was a list of the employees whom he considered the most qualified to fill positions on the Galvanized-only Line.  (Jones Dep., Pl.'s Ex. F at 103, lns. 16-21; id. at 192, lns. 2-5.)  The plaintiffs contend that this list represented those employees who were pre-selected for retention, in advance of U.S. Steel's offer of the VERP.  Jones contended that his primary focus was the "technical background" of the employees, such as whether they had "mechanical engineering degrees, electrical engineering degrees, or [had] worked in maintenance."  (Id.)  He justified this focus by claiming that the shutdown of the Tin Line required "individuals that are technical to help address issues and train...operators to do the maintenance work."[5]  (Id. at 60, lns. 12-24.)  He based this opinion on his knowledge of the success of the "Protech facility," a facility co-owned by U.S. Steel that had hired "technical people" for all its operating positions.  (Id. at 124, lns. 3-19.)  Jones admitted, however, that he did not do a formal check of personnel files before composing the Roster.  (Id. at 188, lns. 8-14.)  Instead, he based his information on his dealings with the employees over the years and his knowledge of their educational backgrounds and experience.  (Id.)

In explaining his "Pension" notations on the Roster's "Others Not Included Above" list, Jones claimed that the "pension" notation represented his "best guess" as to what those employees would be likely to do in the event of a shutdown (i.e., retire).  (Jones Dep., Pl.'s Ex. F at 73, ln. 6-74, ln. 16.)  Jones admitted that he did not speak to any of these employees about

_____

[5] The plaintiffs do not dispute that those whom Jones pre-selected did in fact possess engineering degrees.  Nor do the plaintiffs present any evidence to suggest that those degrees were irrelevant to job performance.  (See Pl.'s Second Amend. Resp. at 39-43; Pl.'s Amend. Sur-Reply at 12-14.)

4

their retirement intentions before composing the Roster.  (Id. at 73 at lns. 9-21.)  Rather, Jones claimed that he gathered his impressions from conversations and discussions that "everybody" had engaged in during prior Fairless Works restructurings.  (Id. at 76, ln. 23-77, ln. 5.)

According to Robert Kennedy ("Kennedy"), then-Manager of Employee Relations, in the face of a shutdown it was standard practice for U.S. Steel management to "look at...what was required to run the operation after the fact and what positions would be needed."  (Kennedy Dep., Pl.'s Ex. H at 22, lns. 1-5.)

In his testimony on U.S. Steel's procedures before a shutdown, Randall Lee Wynkoop ("Wynkoop"), General Manager of Benefit Administration and Vice President of Administration for U.S. Steel and the Carnegie Pension Fund, said that "[i]t wouldn't surprise" him that Fairless Works management would "try to figure out how many total bod[ies]" would be needed after the closure.  (Wynkoop Dep., Pl.'s Ex. A at 35, lns. 12-14.)  According to Wynkoop, it was standard practice for U.S. Steel when contemplating a voluntary reduction in force to "put together schedules and totals to say how many people are immediately pension eligible versus how may people are not immediately pension eligible" (id. at 36, lns. 11-18), so that the management could "apply a reasonable guess as to what percentage of these immediate retirements are going to take the program" and make an informed cost estimate (id. at 37, lns. 7-9).  However, Wynkoop also testified that he "never predicted" which specific individuals would be likely to retire and that he had "never seen [that] done" by U.S. Steel before.  (Id. at 29, ln. 15; id. at 35, lns. 15-18.)

Also commenting on the company's procedures in the face of a shutdown, Vice President of Employee Relations James Garraux ("Garraux") testified that it would be "irrelevant" to consider performance evaluations in planning a voluntary reduction in force, because any

5

employee could choose to retire, regardless of his or her rating.  (Garraux Dep., Pl.'s Ex. D at 36, lns. 13-23.)

At some point in 2001, U.S. Steel began to contemplate offering a Voluntary Early Retirement Program ("VERP") to the employees at Fairless Works.  (Garraux Dep., Pl.'s Ex. D at 70, lns. 1-19.)  This offer was to be in conjunction with a VERP it was planning to offer to the personnel at its Pittsburgh Headquarters.  (Id.)  Garraux testified that the leadership at U.S. Steel "didn't want to do less for [Fairless Works] than we were doing for the Pittsburgh people."  (Id. at 70, lns. 10-12.)

On August 14, 2001, U.S. Steel publicly announced its intention to close the Tin Line at Fairless Works.  There was much "uncertainty and concern" among the workers about whether U.S. Steel would be conducting involuntary layoffs due to the impending closure.  (Kennedy Dep., Pl.'s Ex. H at 101, ln. 16-102, ln. 12.)  In mid-October 2001, U.S. Steel distributed written materials announcing its offer of the VERP to the sixty-four eligible employees[6] at Fairless Works.  (Pl.'s Second Amend. Resp. at 16.)  U.S. Steel also provided individual estimates to each employee of his or her pension benefits with and without the VERP enhancements.  Most employees at Fairless Works, even younger employees, were eligible for enhanced benefits under the VERP.  (Id. at 2-3; Pl.'s Ex. B.)  Employees were given until November 30, 2001 to elect to participate in the VERP ("the VERP election period").  In the written materials distributed by U.S. Steel, the company informed its employees that "in the event that sufficient reductions are not attained from this Program, layoffs may result."  (Pl.'s Ex. B.)

---

[6] All full-time non-union employees of Fairless Works who had been working for at least one year and were at least twenty-one years of age were eligible for the VERP, including the plaintiffs.  See Pl.'s Ex. B.

On November 8, 2001, U.S. Steel held two information sessions for employees about the VERP. (Pl.'s Second Amend. Resp. at 17.) At these meetings U.S. Steel did not disclose how many jobs would remain at the plant after the shutdown, nor what criteria would be used should layoffs be required. (Id.)

During the VERP election period, Fairless Works supervisors Jones and Kennedy met privately with at least three managers at Fairless Works, who were all Caucasian and younger than the plaintiffs (see Def.'s Resp. to Pl.'s Interrogs., Pl.'s Ex. N, "Ex. D").[7] At least one of

---

[7] Upon a motion for summary judgment, a court considers the non-moving party's admissible evidence, making all reasonable inferences in the non-moving party's favor. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). The plaintiffs have offered direct, non-hearsay testimony that Jones met with at least two managers, Greg Luczny and Mark Cebrick, to discuss the VERP during the election period. (See Jones Dep., Pl.'s Ex. F at 83, lns. 10-23; Luczny Dep., Pl.'s Ex. K at 38, lns. 6-10; Cebrick Dep., Pl.'s Ex. L at 21, ln. 25-22, ln. 8 and 23, lns. 18-25.) However, none of this testimony indicates that Jones told either employee that he would be retained. Jones, Luczny and Cebrick each state that Jones merely inquired about Luczny's and Cebrick's intentions regarding the VERP. Therefore, I conclude that their depositions are admissible evidence that at least those two employees had private meetings with Jones, though these depositions do not show that Jones gave those employees private reassurances.

As I explain later in my analysis of the plaintiffs' claims, in order to prove constructive discharge, a plaintiff must show that the employer knowingly permitted conditions so difficult that a reasonable person would feel compelled to resign. See Connors v. Chrysler Fin. Corp., 160 F.3d 971, 974-75 (3d Cir. 1998). As proof of this element, the plaintiffs rely heavily upon the deposition of Raya Szelest ("Szelest"), former personnel analyst at Fairless Works. Szelest claims that Fairless Works managers Greg Luczny, Mark Cebrick, Paul Denis and Suzanna Show individually told her during the VERP election period that they had been informed by U.S. Steel that their jobs were safe. (Szelest Dep., Pl.'s Ex. Q at 21, ln. 24-24, ln. 8.) U.S. Steel argues that Szelest's testimony is inadmissible hearsay. (Def.'s Reply at 17.) The plaintiffs neglect to address this argument in their pleadings. (See, e.g., Pl.'s Sur-Reply at 21-23.) It is clear from their arguments, however, that the plaintiffs offer Szelest's testimony for two purposes: (1) to corroborate Williams's testimony that Szelest told him during the VERP election period that U.S. Steel was reassuring certain employees and (2) to prove as to all the plaintiffs that U.S. Steel knowingly permitted conditions that would compel them to retire – here, by reassuring only select employees about their jobs at the plant.

When offered for the first purpose, Szelest's testimony is not hearsay, because it is not being offered for the truth of the matter asserted, but as evidence of the reasonableness of Williams's perceptions. Therefore, when offered for the purpose of corroborating Williams's

testimony that Szelest told him that employees were being privately reassured, it is admissible evidence.

When offered for the second purpose, however, Szelest's testimony *is* being offered for the truth of the matter asserted (*i.e.*, that U.S. Steel reassured certain employees about their jobs during the VERP election period) and is therefore hearsay. In fact, it is double hearsay: the first level is what Luczny, Cebrick, Denis, and Show allegedly stated to Szelest, and the second level is what Jones or Kennedy allegedly stated to Luczny, Cebrick, Denis, and Show. Under Federal Rule of Evidence 805, both levels must satisfy a hearsay exception in order to be admissible. Thus, I must have some basis to believe that both levels may qualify for a hearsay exception in order to find Szelest's testimony admissible for this purpose.

As to the second level of Szelest's hearsay, the alleged statements by Jones and Kennedy, those statements are likely to be admissible as admissions by a party-opponent under Federal Rule of Evidence 801(d)(2)(A), because Jones and Kennedy arguably made their statements in a representative capacity. Alternatively, their statements may be admissible as admissions by an agent under Rule 801(d)(2)(D), the rule that allows the admission of statements made by an employee concerning a matter within the scope of their employment. It is possible to infer from the evidence in the record that the matter under discussion (the retention of Luczny, Cebrick, Denis and Show) was within the scope of Jones's and Kennedy's employment, given their positions as senior management officials.

As to the first level of Szelest's hearsay, the alleged statements by Luczny, Cebrick, Denis, and Show, there are only two possible hearsay exceptions that might apply: (1) admissions by an agent under Rule 801(d)(2)(D) or (2) statements against interest under Rule 804(b)(3).

In order for a statement to be admissible under Rule 801(d)(2)(D) (admissions by an agent), the employee must be speaking concerning a matter within the scope of his or her employment. Here, there is insufficient evidence in the record to infer that Luczny, Cebrick, Denis, and Show's statements about being retained were within the scope of their employment. Szelest makes no claim that these employees were speaking to her in the course of their duties; rather, her testimony appears to be that these conversations were of a personal nature. (See Szelest Dep., Pl.'s Ex. Q at 21-24.) The job titles of Luczny (Operations Manager), Cebrick (Operations Manager), Denis (Maintenance Manager), and Show (Personnel Manager) do not lead to an inference that their statements to Szelest were within the scope of their employment. (See Def.'s Resp. to Pl.'s Interrogs., Pl.'s Ex. N, "Ex. A.") With no further evidence in the record to suggest that Luczny, Cebrick, Denis, and Show were speaking in the course of their employment, I lack a sufficient basis to infer that their statements are likely to be admissible as admissions by an agent under Rule 801(d)(2)(D).

In order to be admissible under Rule 804(b)(3) (statements against interest), a statement must be "so far contrary to the declarant's pecuniary or proprietary interest, or so far [tend] to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Here, again, there is a dearth of evidence in the record to infer what Luczny, Cebrick, Denis, or Show's interests might be. There is certainly no indication that any of these employees would be subject to legal liability for their statements.

these managers was told that he would be retained after the closure.[8]  None of these managers

accepted the VERP.  (See Def.'s Resp. to Pl.'s Interrogs., Pl.'s Ex. N, "Ex. D.")

By the end of the VERP election period, forty-three of the sixty-four eligible employees

elected to accept the VERP, including the plaintiffs and eight of the nineteen individuals

---

Further, their statements do not appear to be contrary to any obvious pecuniary or proprietary interests.  Therefore, I lack a sufficient basis to infer that their statements are admissible as statements against interest under Rule 804(b)(3).

Because there is insufficient evidence in the record to find that the second level of hearsay in Szelest's testimony is admissible, I find that Szelest's testimony about the reassurances that Jones and Kennedy allegedly gave to Luczny, Cebrick, Denis, and Show is not admissible to prove the truth of the matter asserted.

The plaintiffs also offer testimony by Kennedy that during the VERP election period Kennedy told Ed O'Reilly, a quality assurance manager, that U.S. Steel was "looking at bringing [O'Reilly] over into the sheet organization." (Kennedy Dep., Pl.'s Ex. H at 69, lns. 6-11.)  Again, considering his position as senior official at Fairless Works, Kennedy's statement to O'Reilly is likely to be admissible as an admission by a party-opponent or an agent under Rule 801(d)(2). Alternatively, it may be admissible as a statement against interest under Rule 804(b)(3), because his admission of recruiting O'Reilly during the VERP election period arguably exposed Kennedy to civil liability for discrimination.  Thus, I conclude that Kennedy's testimony is admissible evidence to show that he privately reassured at least one employee during the VERP election period.

Finally, the plaintiffs find it telling that eleven of the nineteen who were appeared to be pre-selected for retention on Jones's Roster did not take the VERP.  (Def.'s Resp. to Pl.'s Interrogs., Pl.'s Ex. N's "Ex. B.") The plaintiffs' theory appears to be that if a high number of those who were pre-selected on Jones's Roster refused the VERP, the correlation would suggest that those individuals had been advised not to take the VERP; otherwise, why would they turn down the VERP enhancements and take the risk of an ordinary layoff after the closure? However, the correlation between those who were pre-selected by Jones and those who refused the VERP is in fact rather weak: over 40% of those who were allegedly pre-selected by Jones actually *accepted* the VERP.  (See id.)  If the plaintiffs' theory is correct and those who were pre-selected by Jones knew it, why would they take early retirement?  From the facts given, it is unclear.  This weak correlation neither supports nor weakens the plaintiffs' theory.

To summarize, I find that the plaintiffs' admissible evidence of U.S. Steel's private reassurances during the VERP election period consists of Jones's, Luczny's and Cebrick's testimony that they met privately to discuss the VERP during the election period, as well as Kennedy's testimony that he privately met with and reassured O'Reilly during the VERP election period.

[8] See supra note 6.

9

allegedly pre-selected for retention on Jones's Roster.  (See Def.'s Resp. to Pl.'s Interrogs., Pl.'s Ex. N, "Ex. D.")  Five employees who appeared on the bottom list of Jones's Roster (the "Others Not Included Above" list) refused the VERP; two of those were eventually retained.  (Jones Dep., Pl.'s Ex. F, "Jones Ex. 1.")  Of the twenty-one employees who refused the VERP, sixteen were eventually retained at the Galvanized Line after the closure.  (Id.)  At least three of the sixteen who were retained had met privately with Jones during the VERP election period; at least one of the sixteen had been privately reassured by Kennedy during the VERP election period. (See supra note 6.)

On or about June 27, 2002, Vitucci and Embrico filed complaints of age discrimination against U.S. Steel with the Equal Employment Opportunity Commission (EEOC).  (Compl. ¶¶ 34-35.)  On the same date, Williams and Thomas filed complaints of age and race discrimination with the EEOC.  (Id.)  At the plaintiffs' request, the EEOC cross-filed charges with the Pennsylvania Human Rights Commission (PHRC).  (Id. ¶ 36.)  On or about July 7, 2003, the EEOC sent Embrico and Vitucci letters indicating that the EEOC had closed its investigation of their charges under the ADEA.  (Id. ¶ 38.)  On or about July 9, 2003, the EEOC sent Thomas and Williams Notices of Right to Sue.[9]  (Id. ¶ 37.)

### A.    Facts Relating to Nick Embrico

In 2001, Embrico was fifty-seven years old.  (Embrico Dep., Pl.'s Ex. R, "Ex. 2.")  He

---

[9] The plaintiffs do not disclose whether they received right to sue letters from the PHRC. However, the absence of this fact is immaterial because the defendant has not challenged the plaintiffs' exhaustion of administrative remedies.  Seeking an administrative remedy in a discrimination case "is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling."  Zipes v. Trans World Airlines, 455 U.S. 385, 393 (1982).  Thus, the defendant has waived any objection on this point.

was hired at Fairless Works in May 1966.  (Compl. ¶ 9.)  By 2001, Embrico held the non-union

position of shop services manager.  (Embrico Dep., Pl.'s Ex. R, at 17, ln. 16.)  During the

approximately thirty-five years that Embrico worked at Fairless Works, he had been assigned to

"new areas over the years with no training," which led him to believe that he "could have worked

anything in the Galvanized Line" even though it was a new area for him.  (Id. at 61, ln. 20-62, ln.

12.)  Kennedy testified that Embrico would "conceivably" have been qualified for a position on

the Galvanized Line.  (Kennedy Dep., Pl.'s Ex. H at 87, lns. 12-16.)  Jones testified that he would

have considered Embrico as a candidate for retention "[b]ased on my interface with him and

his...performance," although Jones felt that "there were other candidates that had [a] stronger

background in [day-to-day maintenance functions]."  (Jones Dep., Pl.'s Ex. F at 185, ln. 20-187,

ln. 7.)  Embrico has "basically a high school education."  (Embrico Dep., Pl.'s Ex. R at 6, ln. 24-

7, ln. 4.)

On Jones's Roster, Embrico's name was listed on the "Others Not Included Above" list,

with the comment "Pension" and a performance rating of "5A" (out of a possible high of eight)

next to his name.  (Jones Dep., Pl.'s Ex. F, "Jones Ex. 1.")  At U.S. Steel, a rating of five

indicates satisfactory performance and is considered to be an average acceptable score.[10]

During the VERP election period, Embrico spoke with Division Manager Frank Coon

("Coon") about the upcoming shutdown, and Coon informed him that U.S. Steel "hoped...no

later than the end of October to contract out all the services that [Embrico's] departments

_____

[10] According to Kennedy, U.S. Steel performance ratings had a possible high of eight,
with four to five considered "satisfactory"; six to seven, "above average"; and eight, "outstanding
or excellent."  (See Pl.'s Second Amend. Resp., Ex. H at 36, lns. 20-25.)  Kennedy testified that
ratings between four and six were considered an "average acceptable score."  (Kennedy Dep.,
Pl.'s Ex. H at 37, lns. 8-15.)

provided...[a]nd when that happened, [Coon] was going to have [Embrico] lay off all the employees [in his departments]." (Embrico Dep., Pl.'s Ex. R at 39, ln. 12-40, ln. 23.) Jones, Kennedy and Department Manager Preston Henderson ("Henderson") expressly told Embrico that they did not know whether he would be retained at Fairless Works. (Id. at 42, ln. 15-43, ln. 7.) Nonetheless, Embrico surmised from his conversation with Coon that his current position would not exist after the closure. (Id. at 40, lns. 8-16.) Embrico further concluded that he would not be transferred because "[i]n the past, when I was eligible for VERPs before, usually the division manager would call you up into the office and ask you if you had a preference...of where you would like to transfer to. That didn't happen this time." (Id. at 49, lns. 17-22.) Embrico was given a document that estimated that he would receive $564,212 with VERP enhancements, as compared to $434,670 without. (Id., "Ex. 2.") He decided to participate in the VERP because he felt that "[U.S. Steel] forced me to retire....They didn't give me any options." (Id. at 67, lns. 9-11.)

Embrico accepted the VERP on November 2, 2001, at age fifty-seven. (Pl.'s Second Amend. Resp. at 21; Embrico Dep., Pl.'s Ex. R, "Ex. 2.") All sixteen of the managerial employees who were retained after the closure were at least five years younger than Embrico, ranging from twenty-five to fifty-one years of age. (Def.'s Resp. to Pl.'s Interrogs., Pl.'s Ex. N, "Ex. D.")

### B.      Facts Relating to Roy Williams

Plaintiff Roy Williams is African American and was fifty-seven years old in 2001. (Williams Dep., Pl.'s Ex. S, "Ex. 1.") He was hired at Fairless Works in January 1974. (Compl. ¶ 12.) By 2001, Williams held the non-union position of transportation manager. (Williams

12

Dep., Pl.'s Ex. S at 9, lns. 16-17.)   On the Roster prepared by Jones, Williams's name was listed

on the "Others Not Included Above" list, with the comment "Transferable" and a rating of "6A"

next to his name.  (Jones Dep., Pl.'s Ex. F, "Jones Ex. 1.")  At U.S. Steel, a rating of six indicates

"above average" performance and is considered to be an "average acceptable score."  (See supra

note 9.)  Williams describes his educational attainment as "the rough equivalent of about two

years" of college, gained through liberal arts classes he took while in the army in the late 1960s

to early 1970s.  (Williams Dep., Pl.'s Ex. S at 7, lns. 2-21.)

  Williams believed that he "could have continued with the position that [he] had" after the

closure, because U.S. Steel "could have expanded" that position at the Galvanized Line.

(Williams Dep., Pl.'s Ex. S at 55, ln. 24-56, ln. 7.)  Williams had been asked in 1997 if he

wanted to work on the Galvanized Line, an offer that he had refused.  (Id. at 56, lns. 8-14.)

Kennedy testified, once again with the caveat that he had not "look[ed] at...all of the records,"

that Williams could have been qualified to fill a position on the Galvanized Line.  (Kennedy

Dep., Pl.'s Ex. H at 87, lns. 8-10.)  Jones testified that he would have considered Williams for

retention if the other candidates he had pre-selected had not been available.  (Jones Dep., Pl.'s

Ex. F at 185, lns. 8-15.)

  Williams approached two managers about his future job prospects during the VERP

election period, Coon and Jones.  Both declined to give him any advice "one way or the other"

(Williams Dep., Pl.'s Ex. S at 38-43), which Williams took to mean that he would not be retained

(id. at 37, lns. 8-18).  No one advised him to accept the VERP.  (Id. at 43, lns. 16-20.)  Although

Williams had no first-hand knowledge of anyone receiving private reassurances, Williams

testified that Raya Szelest ("Szelest"), then-Personnel Analyst, told him that Greg Luczny and

13

other managers had been told that their jobs were safe.  (<u>Id.</u> at 49, ln. 22-51, ln. 2.)  Williams

decided that he would not be retained, because "no one told [me] that [I was] going to [be]

retain[ed] and [my] seniority meant nothing and they weren't going to transfer [me]."  (<u>Id.</u> at 45,

lns. 2-6.)  Williams was given a document estimating that he would receive $511,203 in pension

benefits with the VERP, compared to $288,899 without.  (<u>Id.</u>, "Ex. 1.")

      Williams accepted the VERP on November 15, 2001, at age fifty-seven.  (Pl.'s Second

Amend. Resp. at 22; Williams Dep., Pl.'s Ex. S, "Ex. 1.")  Of the sixteen employees who were

retained, all were Caucasian.  (Def.'s Resp. to Pl.'s Interrogs., Pl.'s Ex. N, "Ex. D.")  All of these

employees were at least five years younger (ranging from twenty-five to fifty-one years of age)

than Williams.  (<u>Id.</u>)

### C.    Facts Relating to Frank Vitucci

      Plaintiff Frank Vitucci was fifty-four years old in 2001.  (Vitucci Dep., Pl.'s Ex. U, "Ex.

1.")  He was hired at Fairless Works in August 1967.  (Compl. ¶ 11.)  By 2001, Vitucci held the

non-union position of facility maintenance manager.  (Vitucci Dep., Pl.'s Ex. U at 18, lns. 6-21.)

On the "Roster" prepared by Jones, Vitucci's name was listed under "Others Not Included

Above," with a comment, "Pension," and a rating of "4A" next to his name.  (Jones Dep., Pl.'s

Ex. F, "Jones Ex. 1.")  At U.S. Steel, a rating of four indicates satisfactory performance and is

considered to be an average acceptable score.  (<u>See</u> <u>supra</u> note 9.)  Vitucci holds an associate's

degree in business administration and was "in and out for maybe a year and a half" of bachelor's

degree studies at Trenton State University in the late 1970s.  (Vitucci Dep., Pl.'s Ex. U at 5, lns.

4-24.)

      During his tenure at Fairless Works, Vitucci gained experience in "contracting out" and

had "got[ten] involved in every aspect of every form of maintenance [and] production that there is." (Vitucci Dep., Pl.'s Ex. U at 67, lns. 12-17.)  As a result, he believed he was "more qualified" than those who were retained at Fairless Works after the Tin Line closure.  (Id. at 67, lns. 10-11.)  Kennedy testified that Vitucci would "conceivably" have been qualified for a position on the Galvanized Line.  (Kennedy Dep., Pl.'s Ex. H at 87, lns. 12-16.)  Jones testified that Vitucci's "performance as far as controlling the budget was not satisfactory [and] his performance on directing employees to do things directly relating to [the] line was not satisfactory."  (Jones Dep., Pl.'s Ex. F at 182, lns. 3-6.)  Jones also claimed that Vitucci had mishandled a sexual harassment claim that he had been directed to manage in 2001.  (Id. at 178-181.)

During the VERP election period, Vitucci approached Kennedy, Coon and Jones to ask about his job situation, but they advised him that they did not know anything.  (Vitucci Dep., Pl.'s Ex. U at 39, lns. 12-18.)  Neither they nor any other manager advised Vitucci to accept the VERP.  (Id. at 59-60.)  According to Vitucci, Coon told him that his department was going to be "eliminated" and "hinted...in a roundabout way without saying it" that Vitucci's position would no longer exist after the closure.  (Id. at 38, lns. 18-22.)  Vitucci had no first- or second-hand knowledge of anyone receiving private reassurances prior to the VERP deadline, but had been told by Plaintiff Williams that Szelest had told him that others had received private assurances.  (Id. at 33, ln. 22-36, ln. 15.)  Vitucci was given a document that estimated that he would receive $569,905 in pension benefits with the VERP, compared to $418,337 without.  (Id., "Ex. 2.")

Vitucci accepted the VERP on November 11, 2001, at the age of fifty-four.  (Pl.'s Second Amend. Resp. at 21; Vitucci Dep., Pl.'s Ex. U, "Ex. 1.")  Of the sixteen employees who did not

15

elect the VERP and were retained, fourteen were at least five years younger (ranging from twenty-five to forty-nine years of age) than Vitucci; two, who were both fifty-one, were close to Vitucci's age.  (Def.'s Resp. to Pl.'s Interrogs., Pl.'s Ex. N, "Ex. D.")

On or about October 26, 2002, a maintenance outage at Fairless Works was scheduled to occur.  (Pl.'s Second Amend. Resp. at 28.)  In the fall of 2002, approximately two months after Vitucci filed his EEOC complaint, Paul Denis ("Denis"), a mechanical maintenance manager at Fairless Works, contacted Mike Murphy ("Murphy"), an employee of Joule, Inc., an outside contracting company, in order to obtain a project manager to assist Denis during the outage. (Denis Dep., Pl.'s Ex. X at 33, ln. 23-34, ln. 16.)  Murphy contacted Vitucci about this potential job opportunity and Vitucci expressed interest in the position.  (Pl.'s Second Amend. Resp. at 55.)  Vitucci states that Murphy told him that Murphy had gotten his name from Denis.[11]  (Pl.'s Second Amend. Resp. at 29; see Vitucci Dep., Pl.'s Ex. U at 75, lns. 7-13.)  However, Denis denies this assertion, stating that Murphy was the one who suggested Vitucci, and that Denis indicated to Murphy that he was not interested in Vitucci.  (Denis Dep., Pl.'s Ex. X at 34, lns. 9-18.)

---

[11] Vitucci did not conduct a deposition of Mike Murphy. Therefore, the only evidence in the record as to what Murphy stated to Vitucci comes from Vitucci's own deposition.  To the extent that Vitucci's testimony about Murphy's statements is used to indicate Vitucci's intent or state of mind, rather than the truth of the matter asserted, I will assume it is admissible. However, to the extent that Vitucci's testimony is being offered to prove the truth of Murphy's statements about U.S. Steel's actions, it would need to fall under a hearsay exception to be admissible.  Murphy is not an employee or agent of U.S. Steel, nor has U.S. Steel adopted his statements.  Thus, I find that Vitucci's testimony when offered for the truth of the matter asserted is inadmissible hearsay.

According to Vitucci, Murphy told him that he would be meeting with Denis[12] and would inform them of his intention to fill the position with Vitucci.  (See Vitucci Dep., Pl.'s Ex. U at 76, lns. 4-6 and 12-23.)  In his deposition, Denis did not confirm this testimony and indicated that he did not recall the contents of this particular meeting.  (Denis Dep., Pl.'s Ex. X at 67, lns. 11-23.)  Denis claimed that it was Joule, Inc. who made the decision to hire Robert Vander Decker ("Vander Decker") instead of Vitucci.  (Id. at 41, lns. 1-6.)  However, Denis admitted stating his preference to Joule, Inc. for Vander Decker over Vitucci for the independent contractor position.  (Id.)

According to Vitucci, on or about the following day, Murphy informed him that his services would not be needed because U.S. Steel had changed the scope of the project.  (Compl. ¶ 73; Pl.'s Second Amend. Resp. at 29.)

Denis claimed that he was not aware during this period that Vitucci or any of the other plaintiffs had filed discrimination complaints relating to the VERP.  (Denis Dep., Pl.'s Ex. X at 41, ln. 22-42, ln. 12.)  Vitucci testified to his belief that senior managers Jones and Henderson had to have been aware of his EEOC filing, and that Denis would have had to get Joule, Inc.'s choice cleared by Jones and Henderson.  (Vitucci Dep., Pl.'s Ex. U at 80, lns. 5-7.)

Denis admitted that Vander Decker, the individual that Joule, Inc. hired to fill the independent contractor position, had no previous experience in supervising "a half a million

---

[12] In his pleadings, Vitucci states that Murphy met with "representatives" of U.S. Steel, without specifying exactly whom.  (Compl. ¶ 72; Pl.'s Second Amend. Resp. at 29.)  For support, he cites to the portion of Denis's deposition where he was asked to read aloud a written statement by Vitucci.  (Pl.'s Second Amend. Resp. at 29.)  However, in his testimony, Denis fails to adopt Vitucci's statement that Murphy met with U.S. Steel representatives other than Denis.  (Denis Dep., Pl.'s Ex. X at 67, lns. 11-15.)  Thus, I decline to find that Murphy met with U.S. Steel representatives other than Denis in deciding who to hire for the independent contractor position.

dollar outage" such as this one and had never worked at a steel mill before.  (Denis Dep., Pl.'s Ex. X at 78, lns. 16-23 and 35, lns. 23-25.)  However, Denis claimed that Vander Decker "looked like a perfect project manager" (id. at 34, ln. 25-35, ln. 1) because Vander Decker "said all the right things" and "knew how to do all the various Excel spreadsheets" (id. at 35, lns. 2-4).  Denis testified: "I didn't believe [Vitucci] had the administrative background, he had a good working knowledge of people and jobs, but I don't think he could do the Excel spreadsheets I needed done, I didn't think he could do the time reports on the contractors that I needed to have done." (Id. at 35, lns. 14-20.)  To Denis's knowledge, Vitucci "was familiar with our trades" (id. at 79, ln. 3), although he believed that Vitucci had "only operated with two of them..., bricklayers and welders" (id. at 79, lns. 4-5).  Denis could not recall Plaintiff Vitucci having any experience in "direct supervision over machinists and electrical techs and electricians."  (Id. at 79, lns. 7-10.)

Denis stated that the addition of certain projects was the only change made to the scope of the project.  (Denis Dep., Pl.'s Ex. X at 77, lns. 9-16.)  Although Vitucci argues in his Sur-Reply that the scope of the project never changed (see Pl.'s Amend. Sur-Reply at 35), in his deposition he admitted that the scope of the project did in fact increase (Vitucci Dep., Pl.'s Ex. U at 79, lns. 9-11).

D.      Facts Relating to Richard E. Thomas

Plaintiff Richard E. Thomas is African American and was fifty years old in 2001. (Thomas Dep., Pl.'s Ex. T, "Ex. 1.")  He was hired at Fairless Works in 1972.  (Compl. ¶ 10.) By 2001, Thomas held the non-union position of facility manager.  (Thomas Dep., Pl.'s Ex. T at 36, lns. 22-23.)  On the Roster prepared by Jones, Thomas's name was listed on the "Others Not Included Above" list, with the comment "Pension" and a rating of "4A" (out of a possible high of

18

eight[13]) next to his name.  (Jones Dep., Pl.'s Ex. F, "Jones Ex. 1.")  At U.S. Steel, a rating of four

indicates satisfactory performance and is considered to be an average acceptable score.  (See

supra note 9.)  Thomas holds a bachelor's degree in urban studies and a master's degree in library

and information science from the University of Pittsburgh.  (Thomas Dep., Pl.'s Ex. T at 6, ln.

21-7, ln. 14.)

      Over the course of his employment, Thomas was given various performance increases

(Thomas Dep., Ex. T at 115, lns. 18-23), was relocated to other facilities within the company in

various capacities (id. at 45, lns. 7-20), and, as facility manager of sheet finishing, "shared duties

and learned the responsibilities for both the Galvanized Line as a line supervisory [sic] and the

warehouse, finishing warehouses and the sheet temper mill" (id. at 38, lns. 10-22).  As a result,

Thomas felt that he would have been qualified to work on the Galvanized Line.  (Id. at 116, lns.

3-17.)  Kennedy testified that Thomas could have been qualified to fill some position on the

Galvanized Line, although Kennedy qualified his statement with the admission that he had not

"look[ed] at...all of the records" before making this assessment.  (Kennedy Dep., Pl.'s Ex. H at

87, lns. 8-10.)  Kennedy did not address Jones's assertion that those with technical backgrounds

were superior candidates for retention than those without.  Jones indicated that he would have

considered Thomas as a candidate for the Galvanized Line if the other candidates he had pre-

selected had not been available.  (Jones Dep., Pl.'s Ex. F at 185, lns. 8-19.)

      During the VERP election period, Thomas concluded that U.S. Steel would not retain

him after the closure.  He testified: "There were things going on in the plant, Dennis Jones

having meetings with the younger guys, excluding me from those meetings.  These younger guys

---

[13] See supra note 9.

19

who are being positioned by, given specific training that were [*sic*] not being given to me.  These were all indications.  I've been around this company long enough.  I know the culture.  When you're about to be excluded, certain things happen.  Like the changing of my evaluation [down two points from the previous evaluation]..."  (Thomas Dep., Pl.'s Ex. T at 76, ln. 19-77, ln. 3.)  During the VERP election period, Thomas spoke with his immediate supervisor, Gary Pirozzola ("Pirozzola"), about "this so-called list or people's understanding that people were already being selected or appointed or told they were going to be retained."  (Id. at 74, ln. 23-75, ln. 2.)  According to Thomas,[14] Pirozzola told him that "it would be within [Thomas's] best interest to take the VERP.  And having been around long enough and having experienced this kind of stuff before, no more had to be said."  (Id. at 75, lns. 14-21.)  Kennedy acknowledges that Thomas spoke to him about Thomas's "feeling that management wanted to keep the younger... employees."  (Kennedy Dep., Pl.'s Ex. H at 98, lns. 8-16.)  According to Kennedy, his reply to Thomas was "something to the effect [of,] I wouldn't go so far as to say that."  (Id. at 100, lns. 14-15.)  According to Thomas, he asked Kennedy directly, "Bob, you don't have a job for me, do you" (Thomas Dep., Pl.'s Ex. T at 78, lns. 14-15), to which Kennedy "sheepishly put his head down as if [Thomas] had put him on the spot" (id. at 79, lns. 1-2), "ignored the question" and "did not answer" (id. at 78, lns. 14-16).  Thomas was given a document that estimated that he would receive $581,182 in pension benefits with the VERP, compared to $422,970 without.  (Id., "Ex. 1.")

---

[14]  Because I make all reasonable inferences in Thomas's favor, I will assume that Thomas's testimony about statements made by U.S. Steel supervisors to him are admissible as admissions by a party-opponent or agent under Rule 801(d)(2) or as non-hearsay offered for a purpose other than to prove the truth of the matter asserted (*e.g.*, to show Thomas's state of mind).

Thomas accepted the VERP on October 31, 2001, at age fifty.  (Pl.'s Second Amend. Resp. at 21; Thomas Dep., Pl.'s Ex. T, "Ex. 1.")  All three of the African Americans who had been employed at Fairless Works prior to the announced shutdown, including Thomas, elected to participate in the VERP.  (Pl.'s Second Amend. Resp. at 44.)  As a result, no African Americans remained at Fairless Works after the VERP election period.  (Id.)  Of the sixteen managerial employees who did not elect the VERP and were retained, all were Caucasian.  (Def.'s Resp. to Pl.'s Interrogs., Pl.'s Ex. N., "Ex. D.")  Eleven of the sixteen who were retained were at least five years younger than Thomas (ranging from twenty-five to forty-three years of age); five of these employees, ranging from forty-six to fifty-one years of age, were close to Thomas's age or slightly older.  (Id.)

III.    **Legal Standard**

"[S]ummary judgment should be granted if, after drawing all reasonable inferences from the underlying facts in the light most favorable to the non-moving party, the court concludes that there is no genuine issue of material fact to be resolved at trial and the moving party is entitled to judgment as a matter of law."  Kornegay v. Cottingham, 120 F.3d 392, 395 (3d Cir. 1997).  An issue of fact is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

IV.    **Discussion**

   1.    **Age discrimination under the ADEA[15]**

Two types of employment discrimination claims can be brought under the ADEA: claims

---

[15] The plaintiffs' age discrimination claims under the PHRA are to be treated identically to their claims under the ADEA.  See Fasold v. Justice, 409 F.3d 178, notes 7 and 8 (3d Cir. 2005).

of disparate treatment and claims of disparate impact.  See <u>Smith v. City of Jackson</u>, 125 S. Ct. 1536, 1539 (2005).  In a disparate treatment claim, the plaintiff must ultimately show that his age "'actually motivated' or 'had a determinative influence on' the employer's adverse employment decision." <u>Fasold v. Justice</u>, 409 F.3d 178, 183-84 (3d Cir. 2005).  In a disparate impact claim under the ADEA, the plaintiff challenges a specific, facially neutral employment practice that operates to "deprive [the] individual of employment opportunities or otherwise adversely affect his status as an employee." <u>Smith</u>, 125 S. Ct. at 1542.  In such a claim, the plaintiff must show that the practice has an adverse impact on older workers that is not due to reasonable factors other than age.  <u>Id.</u> at 1545.

Here, the plaintiffs bring both types of discrimination claims against U.S. Steel.  I will analyze first their claims of disparate treatment, then their claims of disparate impact.

### A.    Disparate treatment

Disparate treatment may be proven by direct evidence[16] or indirect evidence.  Here, the plaintiffs offer indirect evidence of age discrimination.  Thus, their claims must proceed through the three-step burden-shifting framework established by <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).[17]  The first step is for the plaintiff to establish a *prima facie* case of age

---

[16] Direct evidence is "so revealing of discriminatory animus that it is not necessary to rely on any presumption from the prima facie case to shift the burden of production." <u>Connors v. Chrysler Fin. Corp.</u>, 160 F.3d 971, 976 (3d Cir. 1998) (internal citations omitted).  <u>See</u>, <u>e.g.</u>, <u>Glanzman v. Metro. Mgmt. Corp.</u>, 391 F.3d 506, 512 (3d Cir. 2004) (holding that an employer's inquiry about the plaintiff's retirement plans did not constitute direct evidence of age discrimination, whereas a comment by a possible decision-maker that the plaintiff should be replaced by a "young chippie" did).

[17] The plaintiffs apparently do not contest that their claims must proceed through the <u>McDonnell Douglas</u> burden-shifting framework, as their response to summary judgment proceeds through this framework.  (<u>See</u> Pl.'s Second Amend. Resp. at 32-44.)

discrimination, which creates an inference that the employer acted with a discriminatory motive. McDonnell Douglas, 411 U.S. at 802.  The burden then shifts to the defendant to produce evidence that it had a legitimate business reason for its adverse employment action.  Id. at 802-03.  If the defendant does so, the inference of discriminatory motive is dispelled and the burden shifts back to the plaintiff to show that the defendant's articulated reason is merely a pretext for intentional discrimination.  Id. at 803.  Although the burden of production may shift, the ultimate burden remains with the plaintiff at all times to prove that the employer's adverse employment action was intentionally discriminatory.  Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).

In order to satisfy the first step of the McDonnell Douglas framework, the plaintiff must make a *prima facie* showing that: 1) he is within the protected class, *i.e.*, is over forty; 2) he was qualified to have been retained; 3) he suffered from an "adverse employment action"; and 4) the employer retained a "sufficiently younger" and "similarly situated" individual to permit a reasonable inference of age discrimination.  Anderson v. Consol. Rail Corp., 297 F.3d 242, 249-50 (3d Cir. 2002).  A plaintiff who cannot make a *prima facie* showing of each of these elements cannot survive summary judgment.

Each of the plaintiffs' disparate treatment claims fails, although for different reasons. Embrico, Vitucci, and Williams each fail to establish the third element of the prima facie case – that they suffered an adverse employment action.  I will address their claims first.  Thomas, unlike the other three plaintiffs, has made out a *prima facie* case under the McDonnell Douglas framework.  As I will discuss below, his disparate treatment claim ultimately fails to survive summary judgment, as he is unable to carry his complete burden under the burden-shifting

framework of McDonnell Douglas.

> 1.    Nick Embrico

Embrico has failed to show that he suffered an adverse employment action because he has failed to show that his retirement was involuntary.[18]   Here, Embrico argues that his decision to take early retirement was coerced by the knowledge that he would be fired if he did not retire, such that he suffered a "constructive discharge."  "The test applied to constructive discharge claims is objective: whether a reasonable jury could conclude that [the employer] permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign."  Connors v. Chrysler Fin. Corp., 160 F.3d 971, 974 (3d Cir. 1998).  The employer must "knowingly" permit these conditions.  Gray v. York Newspapers, 957 F.2d 1070, 1082 (3d Cir. 1992) (internal citations omitted).  "An employee is protected from a calculated effort to pressure her into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by her co-workers."  Id. at 1083 (internal citations omitted).  The "intolerability" of such conditions "is not established by showing merely that a reasonable person, confronted with the same choices as the employee, would have viewed resignation as the wisest or best decision, or even that the employee subjectively felt compelled to resign; presumably every resignation occurs because the employee believes that it is in his best interest to resign.  Rather,

--------

[18]   U.S. Steel argues that the plaintiffs have not made a sufficient showing of economic harm to establish that their retirement decision was in fact adverse to their interests.  U.S. Steel asserts that because the plaintiffs obtained enhanced benefits under the VERP, they were in fact benefitted by taking early retirement.  (Def.'s Reply at 49.)  The plaintiffs respond that had they been retained at Fairless Works, they would have eventually earned a greater amount in salary and increased pension benefits than the amount they received in VERP enhancements.  (See Pl.'s Amend. Sur-Reply at 25.)  No evidence in the record definitively supports either contention.  Because I make all reasonable inferences in the plaintiffs' favor, however, I assume that in fact they did sustain economic harm by accepting the VERP.

[i]ntolerability...is assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt *compelled* to resign – that is, whether he would have had no choice but to resign." Connors, 160 F.3d at 976 (quoting Blistein v. St. John's Coll., 74 F.3d 1459 (4th Cir. 1996)) (emphasis in original).  The Third Circuit cites with approval the approach of the Seventh Circuit, which frames the voluntariness issue as "turn[ing] on such things as: did the person receive information about what would happen in response to the choice? was the choice free from fraud or other misconduct? did the person have an opportunity to say no?'" Gray, 957 F.2d at 1081 (quoting Henn v. Nat'l Geographic Soc'y, 819 F.2d 824, 828-29 (7th Cir. 1987)).

Embrico admits that none of the senior management staff gave him any indication either way about what his job prospects might be after the closure.  (Embrico Dep., Pl.'s Ex. R at 42, ln. 15-43, ln. 7.)  According to Embrico, his belief that he would be fired if he did not voluntarily retire was based primarily on Division Manager Coon's statement that U.S. Steel was planning to close the departments under Embrico's management (id. at 39, ln. 12-40, ln. 23) and the fact that, unlike past VERPs, during this VERP he was not asked what his preferences for transfer would be (id. at 49, lns. 17-22).  From these two items, Embrico concluded that U.S. Steel "didn't leave me any options" but to retire.  (Id. at 67, lns. 9-11.)

While these facts show that Embrico faced a very difficult decision regarding early retirement, they fail to rise to the level of constructive discharge.  In Gray v. York Newspapers, the plaintiff Gray alleged that she had been forced to retire because the employer offered her early retirement "out of the clear blue sky," had threatened in the past to remove her from her long-time job assignment, had falsely reassured her about her current job security, and had

"harassed" and "forced out" two of her co-workers. 957 F.2d at 1081, 1074. The court in <u>Gray</u> held that even if it accepted these allegations as true, they did not suffice to prove that Gray would have been unlawfully terminated had she not accepted early retirement. The court found that the plaintiff had "deliberated her options carefully" and voluntarily chose to accept the early retirement package. <u>Id.</u> at 1082-83. Similarly, in <u>Connors v. Chrysler Financial Corp.</u>, the court ruled that the plaintiff failed to show an adverse employment action where the plaintiff, whose employer was being bought out by another company, received "the same general offer of employment that every other employee of [his company] received" and decided to retire early after a difficult deliberation between early retirement or an "uncertain future" at the new company. 160 F.3d at 975. The court found that the plaintiff's decision to retire was "an informed decision based on economic realities," rather than a constructive discharge. <u>Id.</u> at 974. The plaintiff was "not fleeing from a stick, [he] was reaching for a carrot." <u>Id.</u> at 975.

Under <u>Gray</u> and <u>Connors</u>, to establish constructive discharge Embrico must show more than general uncertainty; he must show that the employer knowingly permitted such unpleasant or difficult conditions that a reasonable person in his position would feel "compelled" to retire. <u>Connors</u>, 160 F.3d at 974. Making all reasonable inferences in Embrico's favor, one might conclude that Embrico's position would not have survived the closure of the Tin Line, that he had not been asked about his transfer preferences as he had been in the past, and that he was not among the handful who were rumored to have been reassured about their futures at the plant. On the other hand, based upon Embrico's long and varied work experience at the plant, he reasonably believed he had great potential to be reassigned. Further, Embrico does not dispute that U.S. Steel refused to publicly disclose during the VERP election period how many positions

would remain after the closure nor what criteria would be used in filling them.  He does not contest that he received the same offer of VERP enhancements as other employees with comparable work histories.  Thus, while the facts show that a reasonable person in Embrico's position might view resignation as "the wisest or best decision," Connors, 160 F.3d at 976, they do not show that termination was objectively so certain that he had no choice but to retire. Ultimately, the facts show that Embrico made an informed, voluntary choice to take the enhancements available under the VERP rather than face the serious risk of being laid off. Because Embrico has failed to allege facts that rise to the level of constructive discharge, he has failed to show that he suffered any adverse employment action by his employer.  As a result, his claims under the ADEA cannot prevail.

                2.      <u>Frank Vitucci</u>

        Similarly, Vitucci has failed to show that he was constructively discharged.  Again, even taken in the light most favorable to the plaintiff, the facts surrounding Vitucci's decision to take the VERP establish uncertainty at best.  Vitucci admitted that Kennedy, Coon and Jones pled ignorance when he inquired about his job situation, and that no one advised him to take the VERP.  (Vitucci Dep., Pl.'s Ex. U at 39, lns. 12-18; <u>id.</u> at 59-60.)   He testified that Coon "hinted...in a roundabout way without saying it" that his position would no longer exist after the closure, which "led [me] to believe I wouldn't have a job."  (<u>Id.</u> at 38, lns. 18-22; <u>id.</u> at 44, lns. 21-22.)  However, like Embrico, Vitucci believed himself to be eligible to be reassigned, due to his varied experience at the plant.  (<u>Id.</u> at 67, lns. 12-17.)  Also like Embrico, Vitucci had no way of knowing from U.S. Steel's disclosures how many positions would remain after the closure nor what criteria would be used to fill them.  In essence, Vitucci argues that the *lack* of definite

positive indications about his future should be sufficient to prove constructive discharge.

Taken as a whole, the evidence establishes that Vitucci's future at Fairless Works was quite simply unknowable at the time he took the VERP.  Like Embrico, Vitucci's evidence shows that a reasonable person in his position would have reason to think he might be retained, but also reason to think he might not be retained.  This proffer falls short of the showing necessary to show constructive discharge – that is, it fails to show more than uncertainty.  Thus, for similar reasons as Embrico, Vitucci has failed to prove constructive discharge and his claims under the ADEA must fail.

### 3.   Roy Williams

As with Embrico and Vitucci, Williams has presented insufficient facts to show constructive discharge.  Like Embrico and Vitucci, Williams admits that no one advised him to take the VERP and that neither of the two supervisors with whom he spoke gave him any indication "one way or the other" whether he would be retained after the closure.  (Williams Dep., Pl.'s Ex. S at 38-43.)  He admits that U.S. Steel did not take any direct action to encourage or induce him to retire.  Instead, like Vitucci, he argues that U.S. Steel's failure to affirmatively reassure him made it clear that he had to retire.  It may well be that U.S. Steel's refusal to promise Williams a job after the closure gave him reason to feel uncertain and concerned, particularly given the rumors he had heard that some employees had been reassured.  However, even making these reasonable inferences in his favor, Williams has not met the standard articulated in Gray and Connors: that his employer permitted conditions so intolerable that a reasonable person in his position would have felt compelled to retire.  Thus, his claims under the ADEA must fail.

28

4.      Richard Thomas

Thomas's disparate treatment claim under the ADEA fails as well.  Unlike the other three

plaintiffs, Thomas satisfies all four elements necessary to make out a *prima facie* case of

intentional discrimination.  Ultimately, however, he does not rebut the defendant's assertion that

a legitimate, non-discriminatory reason motivated its adverse employment action.  Thomas's

disparate treatment claim therefore fails the last step of the three-step McDonnell Douglas

framework and cannot survive summary judgment.

i.      Thomas's *prima facie* case

Thomas has made a *prima facie* showing that he suffered an adverse employment action.

Although his proof of constructive discharge is not very strong, Thomas has asserted

particularized facts that go beyond the rumored handful of secret meetings and general

uncertainty alleged by the other three plaintiffs.  Specifically, Thomas offers his testimony[19] that

younger employees were given trainings from which he was excluded; that his latest evaluation

had been lowered two points unexpectedly; that his immediate supervisor, Gary Pirozzola,

directly recommended to him that he accept the VERP; and that when he directly confronted

Kennedy about his imminent termination, Kennedy was silent in such a way that it could

reasonably be interpreted as an affirmation.  (See supra at 18.)  Further, according to Kennedy's

testimony, when Thomas expressed his view to Kennedy that "management wanted to keep the

younger...employees," Kennedy did not clearly disabuse Thomas of the notion, but merely stated

that he "wouldn't go so far as to say that."  (Kennedy Dep., Pl.'s Ex. H at 98, lns. 8-16; id. at

---

[19] On the admissibility of Thomas's testimony, see supra note 13.  U.S. Steel has not
offered any evidence to contradict Thomas's testimony that he was denied trainings given to
younger workers and that the reduction of his performance rating was unjustified.

100, lns. 14-15.)  This statement could reasonably be interpreted as admitting the essence of Thomas's statement and merely quibbling over its characterization.

These additional facts asserted by Thomas tend to give an objectively reasonable basis for Thomas's belief that he would be fired after the Tin Line closure if he did not retire.  Direct recommendations by supervisors to retire may support a plaintiff's belief that he would have been terminated if he had not retired.  See, e.g., Wilkins v. ABF Freight Sys., Inc., Civ. A. No. 03-6610, 2005 WL 2271866 at *5 (E.D. Pa. Sept. 15, 2005) (plaintiff's showing of constructive discharge was sufficient to survive a motion to dismiss, where plaintiff alleged that his employer had repeatedly urged him to retire and at times had threatened him with discharge if he did not retire).

Thomas's alleged exclusion from trainings and the unexpected lowering of his performance rating provide further support for his theory of constructive discharge.  Courts have found that a poor performance rating "coupled with evidence that the employer has used it to the plaintiff's detriment may be considered an adverse employment action."  Allen v. Verizon Pennsylvania, Civ. A. No. 04-1515, 2005 WL 2035858 at *10 (M.D. Pa. Aug. 23, 2005).  Here, Thomas's testimony may support a reasonable inference that U.S. Steel was deliberately positioning him so that he would not be qualified for retention, or alternatively, that U.S. Steel was knowingly signaling to him that he would not be retained.

It is unlikely that any of these facts standing alone would be sufficient to establish a *prima facie* showing of constructive discharge.  Even taken together, they are not very strong evidence.  However, Thomas's deposition as a whole contains "more than 'a scrap of evidentiary material to support his argument,'" which may be sufficient to overcome summary judgment on

30

an issue.  <u>Jackson v. Univ. of Pittsburgh</u>, 826 F.2d 230, 234 (3d Cir. 1987) (reversing a grant of summary judgment where the facts alleged in plaintiff's lengthy deposition sufficiently called into question the employer's legitimate, nondiscriminatory reason for firing plaintiff).  Although Thomas's case of constructive discharge is close to the line, I find that he has made at least a *prima facie* showing of constructive discharge and I will continue to examine his claims under the ADEA in further detail.

Thomas argues, and U.S. Steel does not contest, that he has established the other elements of his *prima facie* case.  First, it is undisputed that at age fifty when he accepted the VERP, Thomas was within the protected class of individuals over 40 years of age.  Thomas has also made a *prima facie* showing that he was qualified to be retained.  He presented evidence that his latest performance rating was within the satisfactory range.  (Jones Dep., Pl.'s Ex. F, "Jones Ex. 1.")  He testified that he had gained supervisory experience at Fairless Works (Thomas Dep., Pl.'s Ex. T at 115, lns. 18-23; <u>id.</u> at 38, lns. 10-22) and had received performance increases over the years (<u>id.</u> at 45, lns. 7-20).  Kennedy testified that Thomas could have been qualified to fill a position on the Galvanized Line.  (Kennedy Dep., Pl.'s Ex. H at 87, lns. 8-10.)  Jones testified that Thomas could have been a candidate for the Galvanized Line, albeit ranked lower than those whom Jones had pre-selected.  (Jones Dep., Pl.'s Ex. F at 185, lns. 17-19.)  Taken together, this evidence shows that Thomas was at least arguably qualified to be retained.

Third, Thomas has made a *prima facie* showing that those who were retained were sufficiently younger and similarly situated.  Thomas has shown that the individuals who were retained were "sufficiently younger to permit a reasonable inference of age discrimination."  <u>See</u> <u>O'Connor v. Consol. Coin Caterers Group</u>, 517 U.S. 308, 312-13 (1996).  "[T]here is no

31

particular age difference that must be shown, but while different courts have held ... that a five year difference can be sufficient,...a one year difference cannot." Showalter v. Univ. of Pittsburgh Med. Ctr., 190 F.3d 231, 236 (3d Cir. 1999). Here, while two of the sixteen who were retained were one year older than Thomas, the remaining fourteen were all at least one year younger than Thomas, with eleven of the sixteen at least five years younger. (See Def.'s Resp. to Pl.'s Interrogs., Pl.'s Ex. N, "Ex. D.") Second, Thomas has made a *prima facie* showing that the sixteen who were retained were "similarly situated" to him. They were all "management-level employees" like himself (Compl. ¶ 42), and the evidence Thomas offered as to his qualifications is sufficient to show that he was at least arguably comparable in quality and type to the employees who were retained. Thus, I find that he has made a *prima facie* case that he was replaced by individuals who were both sufficiently younger and similarly situated.

ii.      U.S. Steel's Legitimate, Nondiscriminatory Reason

Under McDonnell Douglas, once the plaintiff has made out his *prima facie* case, the burden of production then shifts to the defendant, who can "dispel the inference of unlawful discrimination" by articulating a legitimate, nondiscriminatory reason for its adverse employment decision. Gray, 957 F.2d at 1078. "[T]he employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." Burdine, 450 U.S. at 257. This is a "relatively light burden." Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).

Here, U.S. Steel makes two defenses. First, U.S. Steel presents its own evidence to contest Thomas's claim of constructive discharge, arguing that it should not have to provide a legitimate reason for Thomas's constructive discharge because Thomas was never constructively

32

discharged in the first place.[20]  U.S. Steel's position is that even if Thomas has made a *prima facie* showing of constructive discharge, once its rebuttal evidence is considered, Thomas's claim of constructive discharge cannot stand.  U.S. Steel points to the circumstances surrounding its offer of the VERP, particularly its need to reduce the workforce in anticipation of the Tin Line closure and its offer of enhanced benefits under the VERP to all sixty-four eligible employees, a group that spanned a wide age range.  U.S. Steel also disputes Thomas's factual assertion that Jones held secret meetings with managers in order to advise them not to take the VERP, offering admissible testimony to contradict this assertion.  (See supra note 6.)  Given these circumstances, U.S. Steel argues, no reasonable jury could find that Thomas was constructively discharged.  However, U.S. Steel fails to controvert Thomas's factual claims that he was denied trainings that were given to younger workers, that his performance rating was unjustifiably lowered, and that he was directly advised to take the VERP.  Thus, even after considering the defendant's rebuttal evidence, I find that there remains a genuine issue of fact as to whether Thomas was constructively discharged.  Ultimately, however, because Thomas fails to carry his burden under the third step of the McDonnell Douglas framework, this issue of fact turns out to be insufficient to defeat U.S. Steel's motion for summary judgment.

---

[20] In other words, before U.S. Steel offers a legitimate, non-discriminatory reason for the discharge, it seeks to challenge the *prima facie* inference that Thomas suffered a constructive discharge.  As the court in Simpson notes, "an inference may be acceptable at the prima facie stage of the analysis...but not necessarily at the pretext stage where the factual inquiry into the alleged discriminatory motives of the employer has risen to a new level of specificity."  142 F.3d at 646.  Here, although the parties are not yet at the pretext stage of the McDonnell Douglas framework, U.S. Steel seeks to present rebuttal evidence to counter the adverse employment action element of the plaintiff's *prima facie* case.  This seems to be an acceptable approach as a responsive defense to the complaint.  Because the issue of whether Thomas has proved constructive discharge can be addressed prior to the issue of whether U.S. Steel has a legitimate, non-discriminatory reason for the discharge, I will consider U.S. Steel's rebuttal evidence at this stage.

U.S. Steel's second defense is that if Thomas were constructively discharged, it was because he lacked a technical background, not because of his age.  In support of this argument, U.S. Steel has offered Jones's testimony that those with a technical background would be best suited to manage the Galvanized-only Line and that Thomas lacked this background.  (See Jones Dep., Pl.'s Ex. F at 60, ln. 12-61, ln. 7.)  Because U.S. Steel has articulated and provided evidentiary support for a legitimate, non-discriminatory reason for failing to retain Thomas, the burden of production then shifts back to Thomas.

iii.    Thomas's Evidence of Pretext

At the third step in the McDonnell Douglas framework, it is the plaintiff's burden to "proffer evidence that is sufficient to allow a reasonable finder of fact to find by a preponderance of the evidence that the employer's proffered reasons are false or pretextual."  Fasold, 409 F.3d at 184.  Under Fuentes v. Perskie, the plaintiff may show pretext in either one of two ways: (1) by offering evidence from which a fact-finder could disbelieve the employer's articulated legitimate reasons, finding them to be post hoc fabrications or otherwise not really motivating the employment action; or (2) by offering evidence from which a fact-finder could believe that an "invidious discriminatory reason" was more likely than not a motivating or determinative cause of the employer's action.  32 F.3d at 764.

Thomas has offered a body of evidence that he argues is sufficient to establish pretext under either option available under Fuentes.  I will consider this body of evidence separately under each option.

Fuentes's first option is to provide evidence sufficient for a fact-finder to disbelieve the defendant's articulated reason.  A plaintiff who seeks to prove pretext under Fuentes's first

34

option must show "not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." Keller v. Orix Credit Alliance, 130 F.3d 1101, 1109 (3d Cir. 1997). He must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons that a reasonable factfinder *could* find them 'unworthy of credence...'" Fuentes, 32 F.3d at 764-65 (citations omitted). Here, Thomas offers no Keller-type evidence to show that Jones's reliance on technical background was so plainly wrong that it could not have been the real reason. He does not contest that those whom Jones pre-selected possessed a technical background. He does not contest that he lacks this background. Nor does Thomas offer any evidence to suggest that, in fact, technical backgrounds are not helpful or advantageous for the positions on the Galvanized Line. He merely makes a conclusory statement that it is "unbelievable" that "only engineers with technical backgrounds were qualified to operate the mill." (Pl.'s Amend. Sur-Reply at 13.) This unsupported opinion is insufficient to discredit U.S. Steel's asserted legitimate reason for failing to pre-select him.[21]

Next, I will consider Thomas's evidence under Fuentes's second option for proving pretext. Under this option, the plaintiff's burden is to show that invidious discrimination was

---

[21] Thomas argues that he has shown pretext by pointing out Jones's failure to verify his impressions of the employees' technical backgrounds and experience before deciding whom to pre-select for retention. (See Pl.'s Second Amend. Resp. at 41-42.) Thomas argues that it was so unlikely that Jones could have remembered the backgrounds of the listed individuals off the top of his head that pretext can be inferred. However, Thomas does not dispute Jones's long tenure at the plant and his familiarity with the workforce as a result of his managerial position. (See Jones Dep., Pl.'s Ex. F at 72, lns. 17-23; id. at 188, lns. 8-14.) Most importantly, Thomas does not offer any evidence that Jones's assessment of technical background was in any way erroneous. In this context, Jones's failure to conduct a formal records check before making his pre-selections may tend to show carelessness, but it does not make Jones's assessment of technical background less plausible or credible.

more likely than not a motivating or determinative factor in the defendant's adverse employment action. In other words,

> [t]he plaintiff must point to evidence with sufficient probative force that a factfinder could conclude by a preponderance of the evidence that age was a motivating or determinative factor in the employment decision.  For example, the plaintiff may show that the employer has previously discriminated against her, that the employer has discriminated against other persons within the plaintiff's protected class or within another protected class, or that the employer has treated more favorably similarly situated persons not within the protected class.

Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 644-45 (3d Cir. 1998).  In the instant case, Thomas offers a number of arguments in an effort to show that his proof of invidious discrimination is sufficient to go to the jury.

One of Thomas's arguments is that U.S. Steel treated more favorably similarly situated persons outside the protected class (*i.e.*, individuals under 40 years of age).  In determining whether an individual is similarly situated to a plaintiff, Simpson v. Kay Jewelers establishes the proper focus.  "[T]he focus is on *the particular criteria or qualifications identified by the employer* as the reason for the adverse action...The employee's positive performance in another category is not relevant...and neither is the employee's judgment as to the importance of the stated criterion."  Simpson, 142 F.3d at 647 (emphasis added).  In Simpson, the employer claimed that it had demoted Simpson because she "repeatedly failed to attain the store sales quotas and failed to adequately train and motivate her staff to meet quotas."  Id. at 645.  Simpson sought to prove that the asserted reason was merely a pretext for invidious discrimination by showing that a similarly situated younger manager had not been demoted or fired.  Simpson did not dispute that the younger manager's sales quota performance was superior to hers, but instead argued that the younger manager was similarly situated because her evaluation scores were equal

36

to or lower than Simpson's.  Id.  Implicitly, Simpson argued that evaluation scores were more indicative of performance than sales quotas.  Id. at 647.  However, the court rejected this argument and refused to "subjectively weigh factors it considers important."  Id. at 647.  Rather, the court focused solely on the employer's stated criterion, sales quotas, and found that Simpson failed to meet that criterion.  Id.  Thus, the court concluded, Simpson had not shown that she was similarly situated to the younger manager, and neither Simpson's evidence of her high achievement in regards to other criteria nor her personal judgment that the employer's criterion was actually unimportant were sufficient to raise a genuine issue of material fact.  Id. at 647-649.

As in Simpson, Thomas seeks to show pretext under Fuentes's second option by showing that U.S. Steel treated younger, similarly situated workers preferentially.  Thomas argues that those who were retained were both younger and similarly situated to him, yet U.S. Steel treated them more favorably by pre-selecting them for retention.  But Thomas has failed to rebut U.S. Steel's argument that the individuals who were pre-selected for retention were more qualified than Thomas because they possessed a technical background that Thomas lacked.  (See Jones Dep., Pl.'s Ex. F at 60, lns. 12-24.)  In his discussion of his qualifications, Thomas focuses on his extensive work experience at Fairless Works and his resultant trainability.  (See Pl.'s Second Amend. Resp. at 34-35, quoting Thomas Dep., Pl.'s Ex. T at 115, ln. 14-116, ln. 17.)  Like the plaintiff in Simpson, he is essentially asking the court to subjectively weigh the value of the criterion *he* identifies (work experience) over the value of the employer's identified criterion (technical background).  As in Simpson, however, it is not relevant to an analysis of pretext whether Thomas believes that his high performance in a different area trumps the employer's

stated criterion.  Thomas indisputably fails to satisfy the criterion identified by his employer.[22]

He is not, therefore, "similarly situated" to those who were pre-selected.  As a result, Thomas has

failed to show that "similarly situated" individuals were treated more favorably than he.

Another way that Thomas seeks to show invidious discrimination under Fuentes's second

option is to point to the Roster and its attending circumstances: the fact that it was created at all,

its contents, the fact that it was created before the VERP was ever offered, Jones's notations of

performance ratings and "pension" next to certain names in the "Others Not Included Above"

list, and Jones's admission that he did not personally speak to each of the individuals he marked

with the "pension" notation before "guessing" that they would be likely to retire in the face of a

shutdown.  (See Pl.'s Second Amend. Resp. at 42-43.)  Thomas also makes much of statements

by senior U.S. Steel officials Garraux and Wynkoop that "the use of pension status *and*

performance as a consideration in any type of layoff is strictly forbidden."  (See id.)  Thomas

appears to argue that the totality of these circumstances raises an inference that invidious

discrimination was in fact a motivating or determinating factor in U.S. Steel's actions.

First, Thomas points out that Jones did not formally ask the individuals that he marked

---

[22] Thomas believes that pretext is shown by Kennedy's and Jones's testimony that Thomas could have been qualified to fill a position on the Galvanized Line.  (Kennedy Dep., Pl.'s Ex. H at 87, lns. 8-10; Jones Dep., Pl.'s Ex. F at 185, lns. 17-19.)  However, although their testimony may have supported Thomas's qualifications for *prima facie* purposes, "at the pretext stage...the factual inquiry into the alleged discriminatory motives of the employer...rise[s] to a new level of specificity."  Simpson, 142 F.3d at 646.  Looking at the facts more closely, Kennedy's assessment of Thomas's qualifications was tempered by his admitted ignorance of Thomas's record.  (See Kennedy Dep., Pl.'s Ex. H at 87, lns. 8-10.)  Thus, on its own terms, Kennedy's assessment fails to contradict Jones's assertion that Thomas lacked a technical background and thus was inferior to those whom he did pre-select.  Secondly, while Jones testified that Thomas could have been a candidate for retention, Jones nonetheless considered him to be lower than those whom he had pre-selected.  (See Jones Dep., Pl.'s Ex. F at 185, lns. 17-19.)  Thus, Jones's testimony is internally consistent with his statement that he preferred those with technical backgrounds.

with the word "pension" about their intentions before making the Roster, apparently arguing that Jones's "guesses" about retirement preferences were so suspect or improbable that they should be discredited as his real reason for making the "pension" notations.  However, U.S. Steel offered evidence to explain the seeming inconsistency: Jones asserted that he knew of those employees' retirement preferences from his past conversations with them during U.S. Steel's many prior restructurings.  (See Jones Dep., Pl.'s Ex. F at 76, ln. 23-77, ln. 5.)  Thomas, for his part, has provided no evidence to contradict this assertion.  As a result, Jones's failure to confirm his impressions of those employees' retirement preferences does not appear to be much of an inconsistency, although it may provide some weak support for an inference of pretext.

As to the circumstances surrounding the Roster, Thomas is correct that the creation of the Roster before the VERP was offered tends to show that U.S. Steel had already pre-selected a certain cadre of managers by that point.  Making further reasonable inferences in his favor, a jury could also find that U.S. Steel made efforts during the VERP election period to retain that cadre of pre-selected managers, in violation of company policy.

However, even accepting these contentions as provable, Thomas has not provided sufficient evidence from which to infer that U.S. Steel failed to retain Thomas on the basis of age.  Contrary to Thomas's assertions, the Roster does not speak for itself.  First, the Roster lists no ages for any individual on the top or bottom list, so the document gives no indication on its face that age was a consideration in the pre-selection process.  Further, Thomas has not provided any evidence whatsoever about how U.S. Steel's pension plan works, such as how pension benefits at U.S. Steel might be connected to the age of an employee.  Thus, there are no facts in the record to indicate that the "pension" notation (whether it is interpreted to indicate pension

39

eligibility, vesting, enhancement, or any other factor significant to pension status) could be considered synonymous with or correlating to a given age or age group.[23]   Finally, although the Roster may be sufficient to show that U.S. Steel had already pre-selected a certain line-up of managers when it offered the VERP, Thomas has not provided any evidence to connect that desired outcome with discriminatory animus.   Without that connection, it cannot be reasonably inferred that age was a motivating or determinative factor in U.S. Steel's pre-selection process.   Thus, looking at the evidence in its totality, it is insufficient to satisfy Thomas's burden to show that invidious discrimination was more likely than not a motivating or determinating factor in U.S. Steel's failure to retain him, under Fuentes's second option for proving pretext.

In sum, Thomas has failed to show pretext through either of the two options afforded by Fuentes and so has failed to meet his burden under the final step of the McDonnell Douglas framework.   Therefore, his claim of disparate treatment under the ADEA must fail.[24]

_____

[23] Because Thomas has not provided any evidence whatsoever to connect the word "pension" in this context with age, the instant case is distinguishable from cases in which courts have found that a facially neutral criterion may be treated as an age-based criterion in fact.   In Erie County Retirees Ass'n v. County of Erie, 220 F.3d 193, 211 (3d Cir. 2000), for example, the court held that Medicare eligibility "does not merely 'correlate with age,'...[but] is a direct proxy for age," such that the employer's adverse employment action on the basis of the employee's Medicare eligibility could be considered a de facto age-based decision.   Here, however, there is no evidence to indicate that the word "pension" correlates with age.   Pension status may involve factors unrelated to age, such as years of service or job title.   In the instant case, the plaintiff has pointed to no evidence whatsoever of what factors may establish pension status at U.S. Steel.   In the absence of any evidence on this point, I will not presume that there is a correlation between a given age and pension status at U.S. Steel.

[24] I note here that even if I assumed arguendo that Embrico, Williams and Vitucci had been constructively discharged, such that their claims would proceed through the next steps of the analysis, their claims would fail for the same reasons as Thomas's claims.

Aside from the adverse employment action element, Embrico, Williams and Vitucci have satisfied the other elements of a prima facie claim.   It is undisputed that Embrico, Williams, and Vitucci are over forty and thus are within the protected class.   Each has offered sufficient evidence that he was qualified to be retained.   (See supra at 12, 14, 15.)   Each has made at least a

B.       *Disparate impact under the ADEA*

In a disparate impact claim, a plaintiff challenges an adverse employment action resulting

from a facially neutral practice, alleging that the practice has a disproportionate impact on

members of the protected class.  See <u>Smith</u>, 125 S. Ct at 1542.   As a threshold matter, however,

a plaintiff must have first suffered some type of adverse employment action before he can bring a

cognizable disparate impact claim.  See <u>id.</u> at 1540 (the applicable language in the ADEA and

Title VII prohibits employer actions that "deprive any individual of employment opportunities or

otherwise adversely affect his status as an employee").  In the instant case, because I have already

found that Embrico, Williams and Vitucci did not suffer an adverse employment action under my

analysis of their disparate treatment claims under the ADEA, I find that they have not made

*prima facie* claims of disparate impact under the ADEA.  Because I find that Thomas has made

at least a *prima facie* showing of constructive discharge, I will proceed to consider his disparate

impact claim.

Thomas challenges U.S. Steel's facially neutral practice of pre-selecting employees for

―――――――――――――――

*prima facie* showing that they were replaced by someone "sufficiently younger" and "similarly
situated." (<u>See</u> <u>supra</u> at 12, 14, 15.)
         However, neither Embrico, Williams nor Vitucci have shown that U.S. Steel's legitimate
reasons for its implementation of the VERP are merely pretextual.  As with Thomas, they have
failed to offer sufficient evidence that the Roster on its face discriminates on the basis of age or
was implemented with a discriminatory intent.  Further, they have failed to show that they are
similarly situated enough to those who were retained to show pretext.  Like Thomas, neither
Embrico, Williams nor Vitucci dispute that they lack the technical background that was Jones's
stated criterion.  Embrico, furthermore, has failed to rebut Jones's assessment that Embrico had
less maintenance experience than other managers.  Similarly, Vitucci has failed to rebut in any
way Jones's stated concerns about his unsatisfactory budget compliance and his mishandling of a
sexual harassment claim that came under his management.  (<u>See</u> <u>supra</u> at 15.)  Thus, because
Embrico, Williams and Vitucci have failed to show that U.S. Steel's stated reasons for failing to
retain them were pretextual, their claims would not prevail even if allowed to proceed through
the <u>McDonnell Douglas</u> analysis.

retention on the basis of technical background.[25]  In order to make a viable disparate impact

claim under the ADEA, a plaintiff must identify a "specific test, requirement, or practice...that

has an adverse impact on older workers," also known as the Wards Cove test.  Smith v. City of

Jackson, 125 S. Ct. 1536, 1545 (2005); see Wards Cove Packing Co. v. Atonio, 490 U.S. 642

(1989).  Here, Thomas argues that Jones's reliance on technical background disproportionately

excluded older workers from being pre-selected for retention, and because older workers were

not pre-selected, they were induced to retire.  (Pl.'s Amend. Sur-Reply at 15-16.)

In support of his claim, Thomas offers data from which some statistical disparities are

apparent.  According to his evidence, before the VERP the average age of the managerial force at

Fairless Works was approximately 49, with an approximate median age of 50.5.  (See Def.'s

Resp. to Pl.'s Interrogs., Pl.'s Ex. N, "Ex. B.")  In comparison, the average age of Jones's pre-

selected employees was approximately 43.6, with an approximate median age of 48.  (See Jones

Dep., Pl.'s Ex. F, "Jones Ex. 1.")  Furthermore, the average age of those who were retained after

the Tin Line closure was approximately 40, with an approximate median age of 41.5.  (See Def.'s

Resp. to Pl.'s Interrogs., Pl.'s Ex. N, "Ex. D.")  Thus, Thomas has offered data from which one

can observe some difference in the average age between the before-VERP workforce and Jones's

Roster, and between the before- and after-VERP workforce.

---

[25] Thomas claims that "a jury will have several alternatives from which to choose a
practice by U.S. Steel which had an adverse impact on older employees."  (Pl.'s Amend. Sur-
Reply at 15.)  According to Thomas, those alternatives include Jones's pre-selection of workers
who were "almost all" younger than the plaintiffs, Jones's reliance on technical background as
his criteria for the Roster, and U.S. Steel's targeting of private assurances to younger employees,
but not to older employees.  Thomas appears to misunderstand the essential nature of a disparate
impact claim.  It is a challenge to a facially *neutral* practice, not a facially discriminatory
practice.  Here, because Jones's technical background criteria is the only facially neutral practice
that Thomas identifies, I address only this part of his disparate impact claim.

However, it is not enough merely to show some disparity; Thomas must point out

*sufficiently substantial* disparities to allow an inference of discrimination.  Watson v. Fort Worth

Bank & Trust, 487 U.S. 977, 994-97 (1988).  There is no "rigid mathematical formula" that

courts must follow; instead, courts must take into account the surrounding facts and

circumstances in order to assess the usefulness of statistical data.  (Id.)  Here, however, Thomas

has offered nothing more in support of his disparate impact claim than the raw data from which

the above disparities may be noted.  He has offered no evidence at all, expert or otherwise,

tending to interpret this data or to prove that any observed disparities are statistically

significant.[26]  In the absence of any such evidence, Thomas's evidence does not meet his burden

to show sufficiently substantial disparities to establish an adverse impact.

Even assuming that an adverse impact exists, if a court finds that the impact is

attributable to reasonable factor other than age, no liability attaches to the employer under the

ADEA.  Smith, 125 S. Ct. at 1544.  Here, U.S. Steel offers two reasonable, non-discriminatory

explanations for any observed disparities.  First, U.S. Steel argues that even if its reliance on

technical background in pre-selecting employees did cause an adverse impact, its action was

reasonable.  Specifically, U.S. Steel points to Jones's testimony that those with technical

---

[26] U.S. Steel argues that the age composition of the workforce before and after the VERP and closure fail to show an adverse impact because 85.9% of Fairless Works's non-union managers were 40 or older before the VERP, as compared to 68.7% after the VERP.  (See Def.'s Reply at 48.)  Regardless of whether or not this is a statistically significant change, U.S. Steel's reliance on the 40-year line is misplaced.  As the Court explained in O'Connor v. Consolidated Coin Caterers Group, 517 U.S. 308 (1996), the purpose of the ADEA is to prevent discrimination on the basis of age, regardless of whether the one who is illegally favored is over 40 or under 40. See id. at 310-313.  "The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as he has lost out *because of his age.*"  Id. at 312.  Because U.S. Steel erroneously analyzes the data based solely on the 40-year-old line, I will not credit its argument.

backgrounds would be able "to help address issues and train...operators to do the maintenance work," and thus would be better equipped to run the Galvanized Line after the closure.  (Jones Dep., Pl.'s Ex. F at 60, lns. 12-24.)  U.S. Steel is correct that this testimony tends to show the reasonableness of Jones's focus on technical background.

As discussed earlier in my analysis of his disparate treatment claim, Thomas has failed to rebut this testimony.  He does not dispute that those on Jones's Roster do possess a technical background.  Nor does he dispute that he and those who were not retained lack that technical background.  Although Thomas disparages Jones's reliance on technical background as "fanciful," "remarkabl[e]," and "unbelievable"  (Pl.'s Amend. Sur-Reply at 12, 13, 16), he provides no evidence to suggest that a technical background is in fact irrelevant to the positions he wished to fill.  Thomas argues that "U.S. Steel has failed to present any evidence that managing union steel workers at a finishing plant requires an engineering degree....there is not one iota of evidence on record to suggest that finishing a galvanized steel product in 2001 was any different than making a galvanized steel product from scratch, as these four Plaintiffs did at the start of their careers.  The record is devoid of any great innovations planned for the galvanized line to explain U.S. Steel's sudden need for technical degrees..."  (Pl.'s Amend. Sur-Reply at 12-13.)  However, Thomas misstates U.S. Steel's position.  U.S. Steel does not claim that due to technological innovations, engineering degrees are necessary to run the Galvanized Line.  Rather, U.S. Steel claims that due to the reduction in operations and staff from the Tin Line closure, individuals with engineering degrees will be more effective managers of the Galvanized-only Line.  In addition, Thomas misstates U.S. Steel's burden.  Here, U.S. Steel need not show that there were no other reasonable ways for it to achieve its goals.  See Smith, 125 S.

Ct. at 1546.  U.S. Steel's burden is merely to show that the non-age factor responsible for the statistical disparity was reasonable.  It has done so. It is ultimately the plaintiff's burden to prove discrimination, and he has failed to meet that burden by failing to contradict U.S. Steel's evidence of reasonableness.

Secondly, U.S. Steel argues that any statistical disparity was not in fact caused by age *or* technical background, but by the fact that U.S. Steel designed the VERP to offer increasing enhancements according to longer work histories at the plant.  Younger workers, in contrast to older workers, tended to have shorter work histories, and thus, had less to gain in VERP enhancements than older workers.  (Def.'s Reply at 48-49.)  As a result, U.S. Steel argues, the fact that older workers took the VERP in greater numbers than younger workers reflects the age-neutral fact that older workers had more to gain financially due to their longer work histories. (Id.)

It is the plaintiff's burden to show that the adverse impact is causally linked to the facially neutral practice he seeks to challenge.  Wards Cove Packing, 490 U.S. at 656.  Thomas does not provide sufficient evidence to favor his theory that the adverse impact was caused by older workers' lack of technical background, rather than U.S. Steel's plausible explanation that older workers chose to retire out of their financial self-interest.[27]  In regards to his theory of causation, Thomas offers no evidence from which a fact-finder may conclude that older workers tended to lack a technical background.[28]  Thus, there does not appear to be any reason to conclude that

---

[27] Nor does Thomas bring any challenge to the reasonableness of U.S. Steel's decision to offer increasing enhancements according to length of service.

[28] Although the record shows that those whom Jones pre-selected had a technical background and that the plaintiffs did not, there is no indication in the data provided by Thomas about the backgrounds of the other older workers who were not pre-selected for retention.

technical background disproportionately singled out older workers for exclusion.  Meanwhile,

regarding U.S. Steel's theory of causation, Thomas does not contest U.S. Steel's assertion that

older workers generally stood to gain more from the VERP than did younger workers.  Thus,

U.S. Steel's evidence that reasonable, non-age factors were responsible for any statistical

disparity in the age of the workforce after the VERP stands largely uncontroverted.

    For the above reasons, Thomas's disparate impact claim under the ADEA is not viable.

**2.      Race discrimination under Title VII (Plaintiffs Thomas and Williams)[29]**

    Williams and Thomas, who are both African American, bring disparate treatment and

disparate impact claims under Title VII, arguing that U.S. Steel's implementation of the VERP

constituted discrimination on the basis of race.

    Like the ADEA, Title VII provides a cause of action for employees who have suffered

some type of discriminatory adverse employment action.  See Jones, 198 F.3d at 411.  As I

discussed in my analysis of his disparate treatment claim under the ADEA, Williams has failed to

show that he suffered an adverse employment action (namely, constructive discharge).  Thus, his

claim of race discrimination is not actionable under Title VII.  As in my analysis of his claims

under the ADEA, because Thomas has arguably proven sufficient facts to establish constructive

discharge, I will proceed to examine Thomas's claims under Title VII in more detail.

    _____*A.      Disparate treatment under Title VII (Plaintiff Thomas)*

     As with his age discrimination claims, Thomas does not offer direct evidence of racial

---

[29] The plaintiffs' race discrimination claims under the PHRA are to be treated identically
to their claims under Title VII.  See, e.g., Weston v. Pennsylvania, 251 F.3d 420 (3d Cir. 2001).

discrimination.[30]   Therefore, his claim must proceed through the same McDonnell Douglas

burden-shifting framework used to analyze his disparate treatment age discrimination claim.  See

Jones, 198 F.3d at 410.

The plaintiff must first make a *prima facie* case, showing that: 1) he is a member of a

protected class; 2) he is qualified to have been retained; 3) he suffered an adverse employment

action; and 4) the circumstances of this adverse action give rise to an inference of unlawful

discrimination, "such as might occur when the position is filled by a person not of the protected

class."  Jones, 198 F.3d at 410-11.  Thomas has made this showing.  As an African American, he

is indisputably a member of a protected class.  As previously discussed, he has made adequate

*prima facie* showings of his qualifications and that he suffered an adverse employment action.  It

is undisputed that those who were retained were all Caucasian.

As discussed in my analysis of Thomas's disparate treatment claim under the ADEA,

U.S. Steel has met its burden to articulate legitimate reasons for failing to pre-select Thomas for

retention.  Also as previously discussed, Thomas has failed to show that U.S. Steel's reasons for

not pre-selecting him were merely pretextual under either option afforded by Fuentes: (1)

---

[30]  For a definition of direct evidence, see supra note 15.  As to racial discrimination at
Fairless Works, Thomas testified that there was a "culture of mistreatment and/or deception
and/or practices that aren't necessarily always fair and on the up and up."  (Thomas Dep., Pl.'s
Ex. T at 14, lns. 4-7.)  He also testified that U.S. Steel "has never been known as...the best
company for minorities and women to work for."  (Id. at 11, lns. 8-10.)  He testified to past
incidents of racial discrimination that he had experienced and allegedly racist supervisors under
whom he had worked during the 1970s; according to Thomas, none of those supervisors were
involved in the facts relating to the instant action.  (Id. at 141-151.)  He also testified about a
promotion that had been "very difficult" for him to attain, allegedly because of his race, at some
time during the 1980s.  (Id. at 153-155.)  In addition, Thomas mentioned a consent decree that
had been put in place at U.S. Steel at some unspecified point in the past.  (Id. at 14, lns. 18-19).
None of this testimony directly indicates discriminatory animus on the part of the decision-
makers who excluded Thomas from pre-selection.  See Price Waterhouse v. Hopkins, 490 U.S.
228, 265 (1989).  Thus, I find that it is not direct evidence of disparate treatment.

discrediting the employer's proffered reason or (2) offering evidence that invidious discrimination was more likely than not a motivating or determinative factor.  32 F.3d at 764.

As discussed fully in my analysis of his disparate treatment claim under the ADEA, Thomas has failed to satisfy the first <u>Fuentes</u> option.  He has failed to point to such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the criterion relied upon by Jones that a reasonable jury could discredit it.  <u>Keller</u>, 130 F.3d at 1108-09.  Kennedy's lukewarm support of Thomas's qualifications, for example, does not contradict Jones's assertion that those with technical backgrounds were nonetheless preferable to Thomas.  (<u>See</u> <u>supra</u> notes 11, 20.)  Jones's failure to do a formal records check is also insufficient to discredit Jones's reliance on technical background, given the fact that Thomas does not contest the accuracy of Jones's assessments.

As evidence that discriminatory motive was more likely than not the cause of his constructive discharge, under the second <u>Fuentes</u> option, Thomas argues that similarly situated Caucasian workers were pre-selected and thus treated preferentially.  However, in determining whether a worker is similarly situated, "[t]he focus is on the particular criteria or qualifications identified by the *employer* as the reason for the adverse action."  <u>Simpson</u>, 142 F.3d at 647.  Thomas does not deny that he lacks the technical background and experience that Jones identified as his criterion for the "Galvanized Only Management Staff" list.  Nor has Thomas offered any evidence to suggest that Jones's reliance on this criterion was ill-founded.  Thus, Thomas has not shown that the Caucasian employees who were treated preferentially were similarly situated to him.

Also under the second <u>Fuentes</u> option, Thomas primarily relies upon his exceedingly

vague testimony[31] about a "culture of mistreatment and/or deception and/or practices that aren't necessarily always fair and on the up and up." (Thomas Dep., Pl.'s Ex. T at 14, lns. 4-7.)  He testified to past incidents of racial discrimination that he had experienced and allegedly racist supervisors under whom he had worked during the 1970s, as well as a promotion that had been "very difficult" for him to attain, allegedly because of his race, during the 1980s.  (Id. at 141-155.)  Thomas makes no allegation that any of those past incidents or past supervisors were were implicated in the events leading up to the instant action.  Finally, Thomas also mentions in his deposition a consent decree that had something to do with racial quotas and had been put in place at U.S. Steel at some unspecified point in the past.  (Id. at 14, lns. 18-19.)  However, Thomas fails to offer any further evidence about this consent decree or the circumstances surrounding it.  At most, Thomas's testimony provides some support for establishing that a generally racially discriminatory atmosphere existed at U.S. Steel at some points in the past.  However, he has provided no evidence from which to infer that the decision-makers who chose not to pre-select him in the fall of 2001 did so on the basis of his race.

Thus, Thomas has not offered sufficient evidence to meet his burden to show pretext under the third step of the McDonnell Douglas burden-shifting framework.  Accordingly his claim of disparate treatment on the basis of race cannot prevail.

B.    Disparate impact under Title VII

Like his disparate impact claim under the ADEA, Thomas's disparate impact claim under

---

[31] Although he was repeatedly pressed to specify, Thomas refused to describe or substantiate what behavior by U.S. Steel formed the basis for his perception of "a culture of mistreatment," aside from mentioning a single discrimination case filed by a Galvanized Line employee, the details of which he would not share.  (See Thomas Dep., Pl.'s Ex. T at 14-26.) Further, Thomas made no allegation that the specific decision-makers who failed to select him perpetuated this culture of mistreatment.

Title VII challenges U.S. Steel's facially neutral practice of pre-selecting employees for retention on the basis of technical background.  He argues that because at least two of the three African Americans employed at Fairless Works lacked a technical background,[32] they were not pre-selected and thus, were induced to retire.[33]

In support of his claim, Thomas offers data that shows that African Americans made up 4.5% of the Fairless Works managerial workforce before the VERP, and 0% afterwards.  (See Def.'s Resp. to Pl.'s Interrogs., Pl.'s Ex. N, "Ex. A"; id.,"Ex. D.")  His evidence also shows that no African American managers were pre-selected by Jones's Roster.  (See Jones Dep., Pl.'s Ex. F, "Jones Ex. 1.")

U.S. Steel argues that this data set is simply too small to be significant.[34]  (See Def.'s Reply at 52-53.)   It is not clear, however, what is necessary for a numerical showing to be statistically significant.  The statistics proffered by a plaintiff seeking to show disparate impact must be relevant to the discrimination alleged.  Newark Branch, NAACP v. City of Bayonne, 134 F.3d 113, 121 (3d Cir. 1998).  Further, a plaintiff seeking to prove disparate impact must point

---

[32] The plaintiff offers no evidence of the technical or educational background of the third African American employed at Fairless Works before the VERP.

[33] I will also assume, as above, that Thomas was harmed by taking the VERP, despite the benefit enhancements he received.  See supra note 17.

[34] In support of its argument, U.S. Steel cites an EEOC regulation, "The Uniform Guidelines on Employee Selection Procedures," 29 C.F.R. § 1607.4 (2005).  This regulation does not help U.S. Steel much.  As a federal regulation, it does not have the force of law, but it may be considered as persuasive authority.  U.S. Steel finds some support in the EEOC's statement that "[g]reater differences in selection rate may not constitute adverse impact where the differences are based on small numbers and are not statistically significant..."  29 C.F.R. § 1607.4(D) (2005).  Overall, however, the thrust of the regulation is similar to the point made by the Court in Watson: that numerical disparities standing alone are not conclusive, and must be considered in their factual context in order to determine whether they show an adverse impact.

out "sufficiently substantial" disparities, for which purpose an overly small data set may be inadequate.  Watson, 487 U.S. at 994-97.  But there is no "rigid mathematical formula"; courts must take into account the surrounding facts and circumstances in order to assess the usefulness of statistical data.  (Id.)  Here, Thomas has identified a disparity that is relevant to the discrimination he alleges.  He has offered evidence that at least two of the African American employees at Fairless Works lacked a technical background and that neither was retained.  While Thomas offers no interpretation of this data to establish its probative value, his evidence establishes some correlation of race with technical background at Fairless Works.  Further, although African Americans were small in numbers to begin with, the disappearance of all of the African American employees after the VERP is arguably a significant practical impact.  Given this showing of disparity and the paucity of evidence from either party analyzing its statistical significance, I will assume *arguendo* that he has made a *prima facie* showing of adverse impact.

Once a plaintiff has made out a *prima facie* case of disparate impact under Title VII, the burden shifts to the defendant to produce evidence that its facially neutral practice is based on legitimate business reasons.  Watson, 487 U.S. at 998.  Here, U.S. Steel again offers its argument that Jones's focus on technical background was justified because managers with technical background would be more effective than those without in managing the galvanized-only line.  Thus, it has offered a legitimate business reason for its focus on technical background.

If the defendant meets its burden to articulate legitimate business reasons, the burden of production shifts back to the plaintiff to "show that other tests or selection devices, without a similarly undesirable racial effect, would also serve the employer's legitimate interest in efficient and trustworthy workmanship."  Watson, 487 U.S. at 998.   I note that if the plaintiff shows that

51

other reasonable alternatives serves the employer's interests, the employer must then reject those alternatives, which is a more stringent test than the mere showing of reasonableness required by the ADEA.  See Smith, 125 S. Ct. at 1546.  However, Thomas has failed to carry his burden to show that U.S. Steel could have chosen an alternative to technical background as a criterion for pre-selection.  He argues in a conclusory fashion that his and Williams's lengthy experience at Fairless Works made them qualified for retention, and seems to imply that this factor should have been considered equally valuable to U.S. Steel as technical background.  (See Pl.'s Amend. Sur-Reply at 12, 13, 16.)  But he offers no evidence to support this contention, such as evidence that his work experience would be functionally equivalent to a technical background for the positions on the Galvanized Line.[35]  Thomas fails to show that U.S. Steel could have served its legitimate business interests by shifting its focus to work experience, rather than technical background.  As a result, Thomas's claim of disparate impact under Title VII may not prevail.

### 3.   Intentional interference with attainment of rights or benefits under ERISA § 510[36]

---

[35] As stated previously in my analysis of his disparate impact claim under the ADEA, Thomas misstates the defendant's position.  Thus, his rebuttal arguments do not contradict U.S. Steel's asserted legitimate reason.  He also misstates the defendant's burden under Title VII. Now that U.S. Steel has articulated a legitimate reason for its facially neutral criterion, Thomas must make a showing that there were other ways that U.S. Steel could have served its interests that would not have had an adverse impact.  Thomas has failed to do so.  Ultimately, it is his burden of proof to show discrimination.

[36] In their Response to Defendant's Motion for Summary Judgment, the plaintiffs raise for the first time a claim that the defendant breached its fiduciary duties in violation of ERISA § 404, 29 U.S.C. § 1140.  In Count II of their Complaint, the plaintiffs allege that the defendant interfered with the plaintiffs' attainment of rights under ERISA; nowhere do they allege facts relating to U.S. Steel's status as a fiduciary or misrepresentations that would constitute a breach of its fiduciary duties.  (See Compl. ¶¶ 52-57.)  I therefore reject the plaintiffs' argument that the allegations in their Complaint were sufficient to put U.S. Steel on notice that the plaintiffs sought to bring a claim of breach of fiduciary duty, even considering the liberal rules of pleading under

Here, the plaintiffs offer indirect evidence to support their claim of employee discrimination under § 510 of ERISA. Thus, my analysis must follow the same basic burden-shifting framework <u>McDonnell Douglas</u>. <u>Gavalik v. Continental Can Co.</u>, 812 F.2d 834, 852-53 (3d Cir. 1987).

First, the plaintiff must make a *prima facie* case, by showing that the employer: 1) discharged, fined, suspended, expelled, disciplined, or discriminated against the employee; 2) for the purpose of interfering; 3) with the attainment of any right to which the employee may become entitled. <u>Gavalik</u>, 812 F.2d at 852-53. As I explained in my analysis of their age discrimination claims, the claims made by Embrico, Williams and Vitucci do not survive the initial step of the analysis, because they have failed to show that they were constructively discharged. As a result, they have no claim that U.S. Steel engaged in any prohibited conduct that would satisfy the first element of the *prima facie* case. As discussed above, however, Thomas has alleged sufficient facts for *prima facie* purposes to show that U.S. Steel constructively discharged him. Thus, I proceed to consider his ERISA § 510 claim more fully.

Thomas makes two different § 510 claims. In his Complaint, Thomas argues that "by offering a VERP that did not provide the same level of benefits to which plaintiffs would have been entitled upon normal retirement, [U.S. Steel] made a conscious decision to interfere with the plaintiffs' attainment of ERISA benefits." (Compl. ¶ 54.) In his Sur-Reply, Thomas argues rather differently that "the 'right' at issue is the right to retire under [the plaintiffs'] own will

the Federal Rules of Civil Procedure. Thus, the plaintiffs' new claim under ERISA § 404 will be disregarded here.

The plaintiffs correctly note that under Federal Rule of Civil Procedure 15, the courts are directed to give leave freely to amend when justice so requires. However, because the plaintiffs failed to move for leave to amend pursuant to Rule 15, it is inapplicable here.

pursuant to what its employer represented as a voluntary early retirement program.  The 'plan' at

issue is the VERP offered them by their employer."  (Pl.'s Amend. Sur-Reply at 32.)[37]

     Under either theory, Thomas has failed to establish a *prima facie* case under ERISA §

510.  First, Thomas has not alleged interference with any rights protected by ERISA.  A plaintiff

with a cognizable § 510 claim must allege that under an existing plan, he had a right to benefits

which his premature discharge (whether constructive or direct) prevented him from realizing.[38]

In his Complaint, Thomas does not make such a claim.  Instead, he seeks to challenge the

financial implications of his constructive discharge, suggesting that had he been retained at

Fairless Works, he would have worked long enough to accrue greater pension funds than the

amount he received under the VERP.  But "[p]roof of incidental loss of benefits as a result of a

termination will not constitute a violation of § 510."  Gavalik, 812 F.2d at 851.  Thomas's claim

as alleged in his Complaint does nothing more than point to an unspecified incidental loss which

resulted from his decision to take early retirement.[39]  As a result, Thomas's § 510 claim as stated

---

     [37] Although this claim alleges a different legal theory than what was alleged in the Complaint, it rests upon the same body of facts as the plaintiffs' age and race discrimination claims.  Thus, the plaintiffs may be said to have "disclose[d] adequate information as the basis of [their] claim for relief" so as to put the defendant on notice of their general claim for relief under ERISA § 510.  Universe Tankships, Inc. v. United States, 528 F.2d 73, 75 (3d Cir. 1975).

     [38] See, e.g., Gavalik, 812 F.2d 834 (class action alleging that institution and implementation of liability avoidance scheme operated to prevent employees from attaining eligibility for employee benefits); Zipf v. American Tel. & Tel. Co., 799 F.2d 889 (3d Cir. 1986) (plaintiff alleging that she was discharged in order to prevent her from obtaining employee benefits under plan); DiFederico v. Rolm Co., 201 F.3d 200 (3d Cir. 2000) (plaintiff alleging that employer terminated her in order to avoid its obligations under its short-term and long-term sickness and disability plans); Romero v. SmithKline Beecham, 309 F.3d 113 (3d Cir. 2002) (plaintiff alleging that she was terminated before she would become eligible for enhanced benefits under a voluntary reduction in force program).

     [39] I note that the Third Circuit has "decline[d] to expand the reach of § 510 to cover the rehiring of former employees with no right or expectation of future employment."  Becker v.

in the Complaint does not involve an ERISA-protected right.

Nor has Thomas made a cognizable claim in his Sur-Reply. There, Thomas alleges that the right with which U.S. Steel interfered was "the right to retire under [his] own will pursuant to what [his] employer represented as a voluntary early retirement program." (Pl.'s Amend. Sur-Reply at 32.) Thomas errs by collapsing the first element of a *prima facie* § 510 claim, prohibited conduct by an employer (here, constructive discharge), into the last element, the plaintiff's right to attain a plan benefit. According to the plain language of ERISA § 510 ("any right to which an employee may become entitled"), its statutory purpose,[40] and the relevant case law,[41] ERISA § 510 protects an employee's right to receive *benefits*, whether pension, disability or otherwise. Voluntariness is not a benefit. Thus, the right to retire voluntarily does not come within the rights protected by ERISA § 510.

Furthermore, under either statement of his claim, Thomas has failed to satisfy the third element of the *prima facie* case, that U.S. Steel had the intent of interfering with his ERISA-protected rights. A plaintiff need not prove that the employer's sole motive was to interfere with protected rights. Dewitt v. Penn-Del Directory Corp., 106 F.3d 514, 522 (3d Cir. 1997). However, "the essential element of proof under § 510 is specific intent to engage in proscribed

Mack Trucks, Inc., 281 F.3d 372, 380 (3d Cir. 2002). It is unclear whether Thomas had a right or expectation to be rehired after the Tin Line closure. Although Thomas has provided sufficient evidence to prove that he could have been retained, this evidence may not be strong enough to infer he had a "right" or "expectation" to be retained. However, because I find his § 510 claim to be incognizable on other grounds, I need not reach this issue.

[40] "Congress enacted § 510 [of ERISA, 29 U.S.C. § 1140,] primarily to prevent 'unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights.'" Gavalik, 812 F.2d at 851.

[41] See supra note 35.

activity...." Gavalik, 812 F.2d at 851.   The only evidence in the record of intentional interference is the appearance of the word "Pension" next to Thomas's name on the Roster prepared by Jones.  Standing alone, without any explanation or narrative, the word "pension" does not give rise to an inference of forbidden intent.  The word "pension" could suggest that U.S. Steel knew that Thomas would attain expensive pension rights should he be retained, and thus lead to the conclusion that it would be in U.S. Steel's interest to coerce him to take early retirement.  However, the word "pension" could just as easily support the inference that U.S. Steel believed Thomas's retirement to be imminent, so that they need not take any action to induce him to retire early.  Thomas offers no evidence to support his interpretation of the Roster as the correct one.  For instance, Thomas offers no evidence that U.S. Steel had any indication how long Thomas intended to work at Fairless Works should he be retained.  From the record created by the plaintiff, there is no reason to infer that U.S. Steel believed it would pay any less to Thomas if they coerced him to accept the VERP than otherwise.

Nor do the circumstances surrounding the VERP raise a reasonable inference of intent to interfere with ERISA-protected rights.  Thomas does not dispute that the VERP was implemented in anticipation of the Tin Line closure.  Nor does he dispute that all of the eligible employees at Fairless Works, even the younger employees, were eligible for enhanced benefits under the VERP.  He has provided no evidence that those who were pre-selected stood in a different position benefits-wise than those who were not.  Thus, the circumstances surrounding his taking of the VERP fail to give rise to inference of intent to interfere with his ERISA-protected rights.

For these reasons, Thomas has failed to establish a *prima facie* violation of ERISA § 510.

56

4.        **Retaliation under the ADEA (Plaintiff Vitucci)**

Vitucci claims that U.S. Steel took an adverse employment action against him in retaliation for his EEOC filing.  The <u>McDonnell Douglas</u> burden-shifting framework is applied to such claims.  <u>Jalil v. Avdel Corp.</u>, 873 F.2d 701, 708 (3d Cir. 1989).

In order to establish a *prima facie* case of retaliation under the ADEA, the plaintiff must show that: 1) he engaged in protected activity; 2) he suffered an adverse employment action subsequent to or contemporaneous with such activity; and 3) a causal link exists between the protected activity and the adverse employment action.  <u>Id.</u>  It is undisputed that Vitucci's filing of the EEOC complaint is a protected activity.  <u>See</u> <u>Fasold</u>, 409 F.3d at 188.  The other two elements, however, are contested by U.S. Steel.

Vitucci alleges that he suffered an adverse employment action when Joule, Inc., a non-party to this action, failed to hire him for an independent contractor position at Fairless Works. He attributes this failure to be hired to the fact that, two months after Vitucci's EEOC filing, U.S. Steel maintenance manager Paul Denis recommended to Joule, Inc. that they hire a different individual.[42]

Vitucci argues that the timing of the events alone establishes a "causal link" between his EEOC filing and the adverse employment action, citing for support <u>Quiroga v. Hasbro, Inc.</u>, 934 F.2d 497 (3d Cir. 1991).  (Pl.'s Second Amend. Resp. at 56; Pl.'s Amend. Sur-Reply at 35.) Neither <u>Quiroga</u> nor the case law of this Circuit clearly supports Vitucci's position.  In <u>Quiroga</u>, the court explicitly rejected the plaintiff's argument that timing alone was sufficient to establish

_____

[42] U.S. Steel does not contest whether, as a threshold matter, U.S. Steel may be held liable for Joule, Inc.'s failure to hire Vitucci.  Thus, I will assume that Vitucci has made a cognizable claim of adverse employment action against U.S. Steel and will proceed to the merits of his claim.

an inference of retaliation.  934 F.2d at 501.  In <u>Farrell v. Planters Lifesavers Co.</u>, the court noted

that

> our case law is 'seemingly split' as to whether temporal proximity between the protected activity and the alleged retaliatory act can be sufficient in itself to create an inference of a causal connection for the purposes of a prima  facie case of retaliation....[W]e caution that this 'split' is not an inconsistency in our analysis but is essentially fact-based. Rather, we have ruled differently on this issue in our case law, depending, of course, on how proximate the events actually were, and the context in which the issue came before us.

206 F.3d 271, 279 (3d Cir. 2000).  In <u>Farrell</u>, the court found "suggestive" the timing of the

plaintiff's termination, three to four weeks after she had rejected a sexual advance by her

supervisor.  <u>Id.</u> at 280.  Ultimately the court declined to decide whether the timing would be

sufficient to create an inference of retaliation, given that "the entire record" established the

inference.  <u>Id.</u>  Similarly, in <u>Hill v. City of Scranton</u>, 411 F.3d 118 (3d Cir. 2005), the court found

that the one-year gap between the conclusion of the police officers' lawsuit against the city and

their terminations provided some support for an inference of retaliation.  However, the court

found it unnecessary to hold that the one-year gap was sufficient to support its "slight" inference

of retaliation, because the inference was further strengthened by the fact that the decision-maker

had lacked a pretext for dismissal until shortly before the dismissal.  <u>Id.</u> at 133.  In <u>Jalil v. Avdel

Corp.</u>, 873 F.2d 701 (3d Cir. 1989), the court reversed a district court's grant of summary

judgment in favor of the employer, where the plaintiff's discharge came two days after the

employer's notice of the plaintiff's EEOC claim.  The court noted that the timing "may suggest

discriminatory motives."  <u>Id.</u> at 708.  However, the court did not rest its holding on the timing

alone.  In finding that the plaintiff had raised a sufficient issue of fact to preclude summary

judgment, the court examined the totality of the circumstances surrounding the plaintiff's

discharge and his EEOC complaint.  <u>See id.</u> at 709.  As the court in <u>Quiroga</u> noted, the <u>Jalil</u>

decision "stopped short of creating an inference based upon timing alone." 934 F.2d at 501.

In considering the overall context of Vitucci's failure to be hired by Joule, Inc., I find that there is insufficient evidence of a causal link between Vitucci's EEOC filing and the adverse employment action to raise a retaliatory inference. Denis, who allegedly blocked Vitucci's selection, testified that he was not aware of Vitucci's EEOC filing during the relevant period. (Denis Dep., Pl.'s Ex. X at 41, ln. 22-42, ln. 12.) Vitucci provides no evidence that would counter Denis's assertion. Vitucci also fails to provide any reason to believe that Murphy, the employee at Joule, Inc. who refused to hire Vitucci, was aware of Vitucci's EEOC complaint. Although Vitucci's Sur-Reply states that "Plaintiff Vitucci testified that Denis knew the [EEOC] Charge had been filed" (Pl.'s Amend. Sur-Reply at 35), Vitucci actually testified in plain terms to the opposite: he stated that he had no information to indicate that Denis was aware that he had filed an EEOC complaint. (See Vitucci Dep., Pl.'s Ex. U at 79, ln. 23-81, ln. 4.) Instead, he surmised that Denis *should* have known of his EEOC filing, because Denis's supervisors should have known of it. (Id. at 80, lns. 5-10.) However, Vitucci has not provided any evidence to substantiate any of these suppositions. Thus, Vitucci has not established a *prima facie* causal link between his failing to be hired as an independent contractor and his filing of an EEOC complaint. As a result, his retaliation claim under the ADEA must fail.[43]

---

[43] Because I find that Vitucci has failed to make a *prima facie* claim of retaliation, I need not reach whether Vitucci's claim would prevail were it allowed to proceed through the rest of the burden-shifting framework. However, I will note that U.S. Steel has met its burden to articulate a legitimate reason for failing to hire Vitucci, explaining that he lacked the "administrative background" and knowledge of Microsoft Excel that the independent contractor position required. (See Denis Dep., Pl.'s Ex. X at 35, lns. 14-20.) Further, U.S. Steel explained that the individual who was hired had a good interview, possessed the requisite knowledge of Microsoft Excel, and otherwise appeared to be a qualified candidate, despite his lack of supervisory experience. (See id. at 34-35.) Because Vitucci does not dispute that he lacked the employer's stated criteria and does not provide evidence to suggest that this criteria was in fact

**V.     Conclusion**

For the reasons described above, Defendant United States Steel Corporation's Motion for

Summary Judgment is **GRANTED** as to all counts.

---

irrelevant to the position, he has not shown pretext.  Thus, his retaliation claim would not prevail
under the final step of the burden-shifting analysis.

## ORDER

**AND NOW**, this _30th __ day of November, 2005, upon consideration of Defendant

United States Steel Corporation's motion for summary judgment (Docket No. 24), Plaintiffs'

Second Amended Response (Docket No. 44), Defendant's Reply to Plaintiffs' Response (Docket

No. 36), and Plaintiffs' Amended Sur-Reply (Docket No. 45), it is hereby **ORDERED** that the

Defendant's Motion is **GRANTED**.

S/Anita B. Brody

_____

ANITA B. BRODY, J.

Copies via **ECF** on _____ to:            Copies **MAILED** on _____ to:

O:\ABB\Embrico Def Summ Jgt Mem&Ord.wpd